

## NUMBER 13-07-00536-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**DIEGO RODRIGUEZ-ESCOBAR, M.D.,**                    **Appellant,**

**v.**

**MICHAEL ALLEN GOSS, STEVEN GOSS,
AND TIMOTHY LEE GOSS, INDIVIDUALLY
AND AS REPRESENTATIVE OF THE
ESTATE OF BEVERLY GOSS,**                    **Appellees.**

---

### On appeal from the 357th District Court of
### Cameron County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Vela
### Memorandum Opinion by Justice Benavides

Appellant, Diego Rodriguez-Escobar, M.D. ("Dr. Escobar"), appeals from a judgment

rendered after a jury trial in a medical malpractice case. The judgment awarded damages

to appellees, Michael Allen Goss, Steven Lynn Goss, and Timothy Lee Goss, individually

and as representative of the estate of Beverly Goss (collectively "the Gosses"), based on

the death of their mother, Beverly Goss. By three issues, Dr. Escobar argues: (1) the evidence is legally and factually insufficient to support a finding of causation; (2) the evidence conclusively established that Dr. Escobar was entitled to official immunity; and (3) in the alternative, the trial court erroneously refused Dr. Escobar's requested instruction on official immunity. We affirm.

## I. Background

**A. December 2002-January 2003**

Beverly Goss was married to Danny Goss in 1968 or 1969 and had three sons with him: Michael, Steven, and Timothy. Michael testified that on Christmas Day 2002, his father moved out of their family's home. Michael explained that Beverly became distraught over the separation, stating often that she did not want to live without Danny.

Michael testified that in late January 2003, he went to Beverly's residence to visit her. Beverly, however, was not at home. When Michael arrived, he found that she had organized her clothing as if she were packing. He also found empty pill bottles and handwritten letters.

Michael reported Beverly missing to the Raymondville Police Department. The police report indicates that Michael also reported that two shotguns were missing from the residence. According to the police report, the South Padre Island Park Police found Beverly "passed out" in her van at the beach on South Padre Island. Michael testified that after Beverly was found, he drove to the beach and retrieved her. He found her depressed and disoriented and decided he needed to get help for her as soon as possible. Therefore, he took Beverly to Dolly Vinsant Hospital "to get screened for a commitment." Michael testified that Beverly was not committed at that time, and he took her home. He was concerned about Beverly's mental state, and she did not improve over the following weeks.

2

## B.     March 17-25, 2003

Timothy testified that on March 17, 2003, he went to visit Beverly.  When he arrived, he saw a hole through her bedroom window.  Michael testified that Timothy called him and told him to come to Beverly's house.

When Michael arrived, the two brothers went to the door.  Beverly answered the door, and she was not injured.  Timothy stated that he and Michael immediately went to Beverly's bedroom to see what had caused the hole in the window.  Michael explained that there "appeared to be a shotgun blast in the headboard of . . . [Beverly's]  bed angled up at the window."  Timothy testified that he found a gun on Beverly's bed covered up with the comforter.

Michael then called the police again in hopes of getting Beverly treated.  A police officer came to the house and spoke to her.  According to the police report, Beverly was "in a daze," indicated that she had tried to hurt herself, and was verbally disoriented.  The police officer took Beverly into custody and transported her to Tropical Texas Center for MHMR (hereinafter "Tropical Texas") for psychological evaluation.  *See* TEX. HEALTH & SAFETY CODE ANN. § 573.001 (Vernon 2003) (allowing the warrantless detention of a person an officer believes to be mentally ill and a danger to himself or others and requiring the officer to immediately transport the person to a mental health facility for evaluation).  Michael testified that, at this point, he knew Beverly needed help and also knew he could not provide the help she needed.

Once at Tropical Texas, Beverly was evaluated by Jamie G. Campbell, a social worker.  Campbell sent Beverly to McAllen Medical Behavioral Health Center ("MMBHC") for further evaluation.  Beverly was still in police custody at this time, and the purpose of the evaluation at MMBHC was to determine if she was subject to being involuntarily

3

committed to the hospital. *See id.* §§ 573.022-.023 (Vernon 2003) (providing for evaluation by a physician to determine if emergency detention is required).

At MMBHC, Beverly was treated by Cesar A. Matos, M.D. Dr. Matos testified that when Beverly was admitted to MMBHC, she told him that she had attempted suicide, and he documented this in his initial assessment in Beverly's records. Dr. Matos diagnosed Beverly as suffering from major depression that he deemed "severe, recurrent, [and] nonpsychotic." He testified that Beverly had suicidal ideation, but no "intention," which he explained as follows: "At the time that the patient is talking to me, she wants to kill herself, but she's not having at the time the intention to do it right there when we are talking." Dr. Matos rated Beverly pursuant to a "Global Assessment of Functioning" scale and assigned her a score of 25, which he stated was "very low." He explained that a score of 100 is perfect.

Based on his assessment, Dr. Matos testified that he believed Beverly needed treatment, and he asked her to sign an application for voluntary admission. Beverly signed the application, which stated she agreed to treatment "until [she was] discharged or until the expiration of four hours after written request for release [was] filed . . . ." Thus, at that time, her treatment became a voluntary admission instead of an involuntary commitment. Dr. Matos admitted Beverly to MMBHC under "suicide precautions," which meant that she was to be carefully observed and checked every fifteen minutes to make sure that she did not try to injure herself.

Beverly spent several days at MMBHC. On March 19, 2003, a family session was held, which was attended by a MMBHC therapist, Roxanne Mata. Mata's notes indicate that Timothy and his wife attended the family session. The notes state that Timothy reported Beverly's prior suicide attempts, was concerned that she would attempt suicide

4

again if let out too soon, and that she "has been manipulative and would say anything to be discharged."

On March 20, 2003, Dr. Matos's notes indicate that Beverly was still very depressed but was denying that she had suicidal or homicidal ideation at that time. At that time Dr. Matos believed that Beverly was improving. On March 21, 2003, Dr. Matos's notes indicate that Beverly was still improving and that she told Dr. Matos that upon her release, her family would care for her:

> The patient is improving. The patient came to talk to me to tell me that there is a plan. Her children are going to be looking after her. There is going to be a lady who is going to be there with her. She wants her grandson to come to the house so she can enroll him back in school Monday and to make his life as normal as possible. I agreed that being that the patient is no longer suicidal she could be dismissed. She gave me a hug, and I told her she could always come back to us if she needs to.

Dr. Matos testified that he planned to discharge Beverly because he believed what she was telling him.

Mata, however, told Dr. Matos that Beverly's family had called to "let us know that what the patient has said [] wasn't the truth[;] it was a pack of lies." Mata told Dr. Matos that the family was unable to devote the necessary time to care for Beverly and that she had been untruthful with him about her family's ability to monitor her. Mata documented the following in her notes, which became part of Beverly's file:

> Therapist was contacted by [patient's] mother who verbalized feelings of anger and concern over psychiatrist[']s decision to [discharge] patient. Therapist [was] made aware that patient had lied to Dr. Matos [and] therapist about having her sons take care of [] her. Mother said that [patient's] sons never agreed to provide care or supervision to her. Therapist [was] made aware that one son was residing in Austin, TX, and that the other son was working in Kingsville, TX. Youngest son Timothy [is] making arrangements to leave the area on a [two]-day trip. Mother stated that she would not take responsibility for patient nor would she pick her up. Mother described herself as "elderly" and stated being unable to care for [patient] [twenty-four] hours a day. . . . Therapist informed son of what [patient] had relayed to Dr. Matos.

5

Son verbalized his concerns and frustration over [patient's] "manipulation" of psychiatrist [and] staff. Son confirmed that his brothers were not in the area [and] had never agreed to take care of [patient] at home. . . . Son admitted that patient had been lying to staff about what family was saying and reported that no family member was available to either pick [patient] up or care for [patient] at this time. Son was reassured that [patient] would not be released unless a family member was available and willing to provide care [and] supervision to patient at home.

Because of this information, Dr. Matos cancelled his plan to discharge Beverly.

Dr. Matos testified that he confronted Beverly with what her family had reported and that a family meeting would be called to clarify their intentions. Mata's notes indicate that when confronted with the truth, Beverly became "easily agitated," "visibly upset," and her tone of voice became "loud and abrupt." Dr. Matos testified that Beverly refused to speak or to take her medications. Dr. Matos's notes indicate that he was very concerned about Beverly's truthfulness:

I believe that patient may not be telling us the whole truth. Her suicidal attempt was very serious. She has only been here five days[,] and I was willing to let her go because I trusted her, but not telling the truth becomes a very important issue[,] and when she was confronted with that, she stopped communication[,] and she is just angry.

Although Dr. Matos removed Beverly's "suicide precautions," he placed her under "close observation" to prevent her from harming herself.

On March 24, 2003, Dr. Matos called Beverly's family to schedule a meeting at the hospital to investigate their ability to care for her. Before the meeting could occur, however, Beverly gave Dr. Matos a "four hour letter," in which she terminated her consent to the hospitalization and requested discharge. Dr. Matos explained that the letter triggered a four hour period in which he had to decide whether to allow Beverly to leave or to seek a court order allowing him to involuntarily retain her. *See id.* § 572.004(b), (c) (Vernon Supp. 2009). Dr. Matos testified that he informed Beverly that even though she

6

had written the letter, he was not going to discharge her and would seek involuntary commitment from a judge because he "didn't feel that she was safe to go home." Dr. Matos testified that thereafter Beverly withdrew the letter and agreed to continued hospitalization.

The family meeting occurred on the morning of March 25, 2003, and Beverly's sons Timothy and Michael attended. Mata's clinical notes reported what happened at the meeting:

> Sons voiced concerns to Dr. Matos [and] therapist over [patient's] compulsion to lie and "manipulate" situations. Sons voiced concerns of [patient's] comment made to youngest son on the phone stating "I can't say I won't try this again" referring to previous suicidal gesture. . . . Sons informed patient of their concern regarding probability that patient will attempt to harm herself and told patient that they loved her and wanted her to get help.

Michael testified that Beverly also stated in the family meeting that she would try to commit suicide again.

Dr. Matos testified that he believed that Beverly needed treatment and stated that Beverly did not want to be treated at MMBHC. Mata's notes indicate that Beverly stated that she wanted to either go to the "State Center in Harlingen or be taken to jail." Dr. Matos's notes state that he believed Beverly was "very unhappy [at MMBHC] and . . . that she will benefit from more therapy. However, at this point, we have no choice but to have her committed after she has signed our . . . four-hour letters before and then rescinded." Dr. Matos found that Beverly had not improved, and her Global Assessment of Functioning score was the same as at intake. Dr. Matos testified that he believed that Beverly was still at risk for suicide at that time, and that she needed inpatient treatment, including medication and psychotherapy. He recommended a transfer to Tropical Texas for assignment to a facility for long term care. When asked why he could not transfer Beverly

7

directly to Rio Grande State Hospital, Dr. Matos stated, "[i]t's a State facility and I have no say in who gets admitted or not there."

To implement the transfer, on March 25, Michael testified that he swore out an affidavit seeking Beverly's involuntary commitment to a hospital. *See id.* § 573.011 (Vernon 2003). This document was included as part of the records sent to Rio Grande State Center. In the affidavit, Michael testified that he believed that Beverly evidenced "mental illness for the following reasons. Recently attempted suicide by shooting herself. She refuses to commit to safety stating to family, 'I will try to do it again.'" Additionally, the affidavit stated that Beverly was "angry, agitated, refusing to eat and take her medication, continues to make suicidal threats." A warrant was issued authorizing a peace officer to take Beverly into custody, and she was transported first to Tropical Texas, where she was evaluated by a psychiatrist named Dr. Quinteros,[1] and then to Rio Grande State Center the afternoon of March 25, 2003. *See id.* § 573.012 (Vernon Supp. 2009).

## C.      March 26, 2003—Beverly sees Dr. Escobar

On March 26, 2003, at Rio Grande State Center, Beverly was examined by Dr. Escobar. Dr. Escobar testified that he was in private practice and that he had privileges to see patients at several local hospitals. When asked if he also "worked at the Rio Grande State Center in Harlingen," he answered, "Yes, I did." He stated that when he was at Rio Grande State Center, his title there was "psychiatrist three," which meant that he had several years of experience and was board certified in psychiatry. Dr. Escobar's curriculum vitae was admitted into evidence, and it states that in March 2003, he was a part-time staff psychiatrist at Rio Grande State Center. His duties at Rio Grande State Center included

---

[1] Dr. Quinteros's first name was not provided.

8

interviewing for the admission of new patients and treatment of admitted patients, and he testified that he interviewed Beverly pursuant to his duties as a psychiatrist at Rio Grande State Center.

Dr. Escobar testified that Beverly presented to him pursuant to a court order because she was believed to be suicidal, and that when patients are presented that way, the admitting physician must follow statutory criteria to determine if an involuntary commitment can be obtained. He explained that the guidelines are strict because admission to the hospital for involuntary commitment deprives the patient of his or her liberty. He explained that if the "elements are not present[,] I cannot commit the patient." He admitted on cross-examination, however, that he was required to exercise "medical discretion" during his examination.

Dr. Escobar testified about the documents he had available to him when he evaluated Beverly. First, he reviewed a "triage form" from Tropical Texas to determine why Beverly was in the hospital and her symptoms. The triage form indicates that the intake employee at Tropical Texas, Alberto Gonzalez, "spoke to son and he state[d] that they are worried that if [Beverly] goes home at this time she may try to overdose. [Patient] went and bought 80 Valium and 100 sleeping pills before going into [MMBHC]. [Tried] to [overdose] two month[s] before being admitted to [MMBHC] and tried to shoot herself with shotgun." Also on this form, Dr. Escobar testified there was a handwritten note by Dr. Quinteros in the file, and it stated:

> The patient has been in the hospital, McAllen Behavioral. She should continue hospitalized [sic]. Patient continues with suicidal thinking with plan. Patient is in need of hospitalization at Rio Grande State Center.

Dr. Escobar stated that he reviewed the warrant and Michael's affidavit seeking

9

involuntary commitment and that he knew those documents stated that Beverly told her family that she would "try to [commit suicide] again." Dr. Escobar also reviewed Beverly's records from MMBHC, which included Dr. Matos's notes from Beverly's admission to MHBHC. The records, however, did not include any other information about her progress while at MMBHC or Mata's notes regarding Beverly's deceitful nature. Dr. Escobar agreed, however, that he knew that Beverly had refused treatment at MMBHC.

Dr. Escobar testified that on March 26, he interviewed Beverly for forty-five minutes. He stated that Beverly participated fully in the interview, that she was calm and cooperative, and that she was never agitated. He explained that he did not believe she was being deceitful and felt that her answers were reliable. Dr. Escobar stated that Beverly denied having tried to kill herself with the shotgun, and she explained that she merely wanted to shoot the marital bed because she was angry with her husband for leaving her, which he found to be a credible explanation.

Dr. Escobar diagnosed Beverly as having "Major Depressive Disorder, Recurrent, Nonpsychotic"; however, he did not believe that she met the criteria for involuntary commitment. Based on his interview, he concluded that Beverly was "not having any suicidal or homicidal ideations at the present time" and that she could be treated with less restrictive means than involuntary commitment. Dr. Escobar assigned Beverly a score of fifty for her Global Assessment of Functioning, which he testified was the lowest score a person could receive and still avoid involuntary commitment. Dr. Escobar testified that he did not contact Dr. Matos or Dr. Quinteros, even though he knew they recommended continuing hospitalization and even though he knew that Dr. Matos had assigned Beverly a substantially lower score on her Global Assessment of Functioning one day earlier.

10

Dr. Escobar concluded that Beverly was not suicidal based solely on his interview with her. He testified that he assumed that Beverly's family would supervise her, but he did not attempt to call any of her family members. Instead, he discharged her "on her own recognizance." He scheduled a follow-up appointment at Tropical Texas for April 1, 2003.

On cross-examination, Dr. Escobar agreed that past history is a factor to consider in determining if a patient may attempt to commit suicide upon release from the hospital. He agreed that "if a person has tried to commit suicide before, that can be an indicator that they may make another attempt." He stated that the likelihood is increased with depression, feelings of hopelessness, and access to firearms. He testified that he assumed that Beverly had a gun, but he also assumed that she was supervised by her family. He also testified that lack of sleep could lead to a lack of good and clear insight, and he admitted that he knew that Beverly had trouble sleeping and for that reason, he prescribed antidepressants and sleeping pills for her. Dr. Escobar testified that if Beverly had been admitted to Rio Grande State Center, she would not have had access to firearms, and he agreed that "she would not have shot herself in the hospital."

**D. Events Leading to Beverly's Suicide on March 30, 2003**

**1. March 27, 2003**

Michael testified that he was surprised when his grandmother called him on March 27, 2003, to inform him that Beverly was at home. He stated that he did not contact the hospital again because he was at his "wit's end as to what else to do." He did not believe that filing another application to have Beverly committed would do any good because she had been released.

Beverly came to Michael's house that day, and he testified that she seemed "better than she was prior to that." Beverly picked up Michael's son, J.D., over whom she had legal custody. Michael explained that he believed he was legally required to let her take J.D. because of the custody order.

That same day, Beverly had a follow-up appointment with her family doctor, Joseph Montgomery-Davis, M.D. His notes show that Beverly was depressed over her husband's departure, but did not mention anything about Beverly being suicidal.

Some time after her release, Beverly spoke to her neighbor, Sheriff Larry Spence, and asked him to find her husband, who she believed was in Florida. She told Sheriff Spence that she wanted to talk to him about J.D. He stated that he asked how Beverly was, and she told him she was "fine." Sheriff Spence testified that he attempted to locate Danny for Beverly.

### 2. March 28, 2003

Joe Compean testified that he is a social service worker at Tropical Texas. He stated that he met Beverly for the first time when he visited her home on March 28, 2003. Compean stated that the only information he had about Beverly at that time was that she had been discharged from the Rio Grande State Center. He was not aware that Beverly had been to Tropical Texas on March 17. Compean stated that the purpose of a home visit is to assess the client in the client's home environment and to "tell them the importance of not missing the appointment that we have just given them so they can continue services."

Compean testified that he did not go inside Beverly's house but only spoke to her at the door for about ten minutes. He described his assessment of Beverly at the home

12

visit as follows: "I can say that she just presented herself well. I mean, it was normal. I can't remember much, but I remember the conversation was, you know, comfortable. Just talking and telling her the importance of the appointment and her being agreeable." Compean reported that she did not appear depressed, sad, withdrawn, agitated, or confused.

### 3. March 29, 2003

Beverly's estranged husband, Danny, testified by deposition that she called him on March 29. He was in Florida at the time with a woman named Debra, whom he had been dating at the time. Danny testified that Debra answered the phone when Beverly called. He stated, however, that Beverly was aware that he was having a relationship with Debra before that phone call. Danny testified that "at least by March 12th, sometime between January 31st, 2003, and March 2003," he and Beverly "came to the conclusion that [they] could no longer live together," and that they had already decided to get a divorce. On the March 29 call, he and Beverly discussed their "financial status" and how they were "going to handle the separation."

Michael testified that he spoke to Beverly on March 29, which was her birthday. When asked if he knew whether Beverly spoke to her husband Danny on March 29, Michael answered, "No, I don't know whether she talked to him that day or not. I know she talked to him, but I don't know exactly when it was." Michael's understanding was that Beverly and Danny intended to "talk some more" and that "she was going to try to get her family back together." He explained that Beverly told him that she had spoken to Danny "[j]ust on their finances, that she had intentions on going after his retirement and alimony and such matters as that." Michael stated that his impression was that "she was ready for

13

divorce." Steven also spoke to his mother on March 29 by phone, and he testified that Beverly told him that she had located his father. On March 29, 2003 at 8:09 p.m., Beverly purchased a gun.

According to Michael, Beverly dropped J.D. off at Timothy's house with Timothy's wife, Cleo. Cleo later told police that she had made plans with Beverly the night before for J.D. to spend the night at her house, and Beverly arrived at her house at approximately 12:30 a.m. with J.D.. Shortly thereafter, Beverly called Cleo and stated that she wanted Cleo to "take care of" J.D. and stated, "I love you all, and take care." Cleo reported asking Beverly if she was okay, to which she replied, "I'm okay but I need to go."

### 4.     March 30, 2003

On March 30, Sheriff Spence testified that he noticed that there was a note on Beverly's door. He called the police and asked the dispatcher to inform Beverly's sons. The transcript of his call to the police was read to the jury. In it, Sheriff Spence told the dispatcher that he believed that Beverly had spoken to her husband the night before. He stated that Beverly told him not to look for him anymore because she had found him. He speculated that "maybe he told her something or something might have drove [sic] her off the edge." Michael received a call from a detective with the Raymondville Police Department telling him about the note, and he went straight to the house where he found the door locked. Michael climbed in the house through a window and found Beverly laying in the bathtub with a bullet wound to her forehead.

## E.     Expert Testimony at Trial

The Gosses filed suit on August 29, 2003, alleging that Dr. Escobar's negligence proximately caused Beverly's suicide. The case was tried to a jury, which heard testimony

14

from two expert witnesses.

Mary Iva Anderson, M.D., a board-certified psychiatrist, testified as an expert witness for the Gosses. She testified that she reviewed all the materials that were available to Dr. Escobar at the time he interviewed Beverly. Dr. Anderson testified that she based her opinion of Dr. Escobar's treatment on the information that he had available to him. She explained that the available information was consistent with Dr. Escobar's diagnosis of a major depressive disorder, "severe or recurrent," which she explained as follows:

> So major depressive disorder is defined by an episode of major depression where for at least a two-week period a person has either sadness or decreased pleasure in activities and five symptoms of impairment in sleep, increased or decreased, impairment in appetite, increased or decreased, decreased interest, feelings of guilt over probably little things often, decreased energy or psychomotor agitation where it's hard to sit still, decreased concentration and suicidal thoughts or thoughts of death. And with those symptoms there is impairment in functioning.
>
> . . . .
>
> [Recurrent] means that you've had at least a two-month period without symptoms and you've had major depressive episodes that recur over time. Severe means that you have an excessive number or severity of symptoms.

Dr. Anderson testified that when Beverly left Dr. Matos's care on March 25, Beverly's Global Assessment of Functioning score was 25, which meant that she had "severe impairment of functioning." The basis for this score, Dr. Anderson opined, was that Beverly had reported suicide attempts and was "hopeless," with "severe depression, tearfulness and impulsively impaired judgment and insight."

Dr. Anderson testified that the March 25 intake form from Tropical Texas, before Beverly was sent to Rio Grande State Center, stated that Beverly's "risk factors" for "suicidality" included "prior attempts," "impulsive behavior," "minimal support systems,"

15

"depression," "major or multiple losses," and "access to firearms." With respect to the prior attempts, Dr. Anderson testified that the form stated explicitly that Beverly had attempted suicide with a gun. She opined that this was significant because of the lethality of the instrument used in the suicide attempt—in other words, she explained, the risk of a person being successful in their attempt to commit suicide is much greater with a lethal weapon such as a gun. The form also noted that Beverly had tried to overdose on medication. Dr. Anderson stated that "prior attempts and especially recent prior attempts are more predictive of a person who when they are depressed being more likely to do what they've done in the past, which is to attempt again." She stated that it was significant that the form stated that Beverly had access to firearms because "if it's readily available, that's an even greater risk than if somebody has to say go out and get a gun. And so it is one of the factors that we assess." Dr. Anderson further stated that "impulsive," with respect to a patient, means that the person may "seem okay one second and the next second they may not be."

Additionally, Dr. Anderson testified that the intake form stated that Beverly was refusing treatment, which shows an "increased risk for suicide because if you're not accepting treatment, then you're not likely to be getting better. It's also indicative of impaired judgment and insight." The note that Beverly had "minimal support systems" was significant because "if one is isolated and not feeling like there's [sic] ways that they cannot feel isolated and low, it sounds like it's a big part of what's going on. That's a problem. Who is she going to go to? Who is she going to talk to?"

Dr. Anderson stated that based on the intake form, Dr. Escobar should have requested more information because Beverly initially admitted she was suicidal, but when she presented to Tropical Texas Center on March 25, she denied that she had been trying

16

to commit suicide and claimed the shooting incident was an accident: "So when the story is changing, it concerns me that this objective report the person is giving may be more of what they want you to hear than whatever the truth is." When asked whether obtaining more information about Beverly could have been done on an outpatient basis, she stated "[f]or this patient I would not think at this point in time that it would be safe to do so" and that further hospitalization would have been required.

Dr. Anderson also opined that because Beverly's son had sought the involuntary commitment, Dr. Escobar should have contacted her family to obtain more information:

> [I]n a circumstance like this where the son has filed paperwork that says that she's telling the family that she's going to try to kill herself again, that's important information because that commonly does happen where the patient is not telling this clinician what they're thinking but that they have told family members, and that the family members may know of things like the fact that allegedly she had been stockpiling pills.

The records did not indicate that Dr. Escobar made any attempt to contact Beverly's family. Dr. Anderson also reviewed the handwritten note by Dr. Quinteros recommending further hospitalization.

Dr. Anderson testified that a psychiatrist should not simply rely on a patient's statement that they are not suicidal, particularly when the patient has recently attempted suicide: "When somebody is suffering from a major depressive disorder, especially when it's severe, they may tell you something that is because it's what they want you to hear as opposed to what they are actually experiencing." She stated that "if it's of this severity where there is a family member saying that she tried to shoot herself and she overdosed and she has a stockpile of pills, that would make it such that I would want to have information that clarified this picture other than her just saying, 'I'm not trying to kill myself.'" Dr. Anderson opined that Dr. Escobar could have obtained more information—he could

17

have requested records from the physician or hospital where Beverly had been hospitalized.

Dr. Anderson testified that in her opinion, Dr. Escobar did not meet the applicable standard of care because (1) he did not consult with Michael, who had filed the paperwork to have Beverly involuntarily committed, who claimed that she would try to kill herself again, and who did not believe the situation was manageable outside the hospital setting; (2) he did not consult with Beverly's other doctors who believed that she needed further hospitalization; and (3) he did not look beyond Beverly's own report that she was not suicidal even though the information available showed that she had "severe depression, recent suicidal ideation, recent suicide attempt, very little change and refusing treatment in that week of hospitalization . . . ."

Dr. Anderson opined that had Beverly received in-patient hospitalization, she could have received treatment for her depression:

> Q. If you have a patient like Beverly Goss who's been in the McAllen Medical Behavioral Center for a week and she's not improving, doesn't look like she's getting better, I mean, in reasonable medical probability, are there treatments available to her that will allow her to overcome this major depressive disorder, or not?
>
> A. There are treatments available that may well help her to become at least less depressed, hopefully better. She's still going to have to deal with the losses that she's dealing with, but it is different when you're feeling better than if you're ill. I mean, if you have the flu, it's hard to deal with a stress. If you have major depressive disorder severe, it's hard to deal with the stress. So it's not going to make her husband come back.
>
> Q. No.
>
> A. But it does change the picture as far as her perspective of what her possibilities are. So you can treat the major depressive disorder, yes.
>
> Q. I mean, that's what I'm really trying to get at. We hear major depressive disorder severe and we've heard about how she is

18

refusing treatment and she's got all of these problems. I mean, if all of that is true, I mean, would it be fair to say, 'Well, there's nothing you could have done. There's nothing anybody could have done to help this lady?"

A. Well, in acute circumstance, there's something that could be done. What forever for the rest of her life, we don't know until we try and treat her when she is acutely ill.

Q. And in the acute circumstance, that means right now while she's seriously, seriously mentally ill?

A. That's right.

. . . .

Q. I mean, the goal is what?

A. Well, that something has changed, that either her depression, hopefully has lessened, that there's a working relationship maybe with some of the family members, that there's a support system that has been implemented, that she has a rapport with the psychiatrist or therapist, that she's actively in treatment and sees options of how to manage what she's not feeling well.

Q. So that she can deal with the stressors in her life?

A. That's right.

Dr. Anderson testified that there was "sufficient information to foresee that without hospitalization and treatment that [Beverly] was at risk for suicide." Dr. Anderson agreed that it may not be possible to know "which day or exactly how or where, but without treatment, in reasonable medical probability" Beverly was at "significantly increased risk." When asked whether it was foreseeable that Beverly might have continued stress from the breakup of her marriage, Dr. Anderson stated that it was likely that "there's going to be ongoing interactions, and that's why you want the person to be in a better place so that when those ongoing interactions occur they don't kind of push you over the top."

When asked if Beverly had been hospitalized, she would have survived, Dr.

19

Anderson stated:

> Well, if she had been in the hospital, I don't think that she would have been able to kill herself, at least not shoot herself. And hopefully if a plan had been in place, then her chance of having a better life would have been there. I don't know long term what her prognosis would have been. It would have depended upon a lot of things.

Additionally, Dr. Anderson stated that she believed that Dr. Escobar's negligence proximately caused Beverly's death and explained as follows: "You have somebody who is severely depressed with all the things we've discussed, all the risk factors and all the red flags, and release them on their own, that it is a reasonable—one might reasonably foresee that a suicide would be the result."

Dr. Escobar presented expert testimony from Fructuoso Irogoyen, M.D. Dr. Irogoyen testified that section 573.022 of the Texas Health and Safety Code states the criteria for determining if a patient can be admitted against his or her will.[2] He explained, however, that the

> psychiatrist is first looking for, you know, what we look for in any patient. You are trying to find out, basically, what is the diagnosis of the patient and what is the chief complaint, what are the causes bringing that person to attention. This combines with the issue of the Section 28 that the first thing you try to determine is the person has a mental illness, which I mention there are other issues like dangerousness.

---

[2] Subsection (b) of section 573.002 provides that a person may only be detained against their will if a physician determines that:

(A)  the person is mentally ill;

(B)  the person evidences a substantial risk of serious harm to himself or others;

(C)  the described risk of harm is imminent unless the person is immediately restrained; and

(D)  emergency detention is the least restrictive means by which the necessary restraint may be accomplished; . . . .

TEX. HEALTH & SAFETY CODE ANN. § 573.022 (Vernon 2003).

20

He explained that if a person does not meet the criteria for involuntary admission, the evaluating physician can recommend other courses of treatment, like outpatient treatment or a voluntary admission. On direct examination by Dr. Escobar, Dr. Irogoyen testified that although a psychiatrist performing an evaluation of this sort is guided by the statute, he must still use his medical judgment in arriving at the diagnosis "because the first requirement in these things is that the person has a mental illness."

Dr. Irogoyen testified that based on his review of Beverly's records, it appeared that there had been "precipitating events" that led to her prior suicide attempts, such as the loss of her husband. When asked if a precipitating event occurred before her successful suicide attempt, he stated, "[A]nalyzing the prior behaviors, it is just expectable that she would respond to an event of that nature, yes." The following exchange then occurred:

Q:      Doctor, if Mrs. Goss had been able to locate her husband and actually talk to her husband on March 29th, 2003, could that have been the precipitating event that led to her suicide?

A.      Well, I imagine that there would be more than just localizing the husband, but that would be part of something, correct.

Q.      Depending on what exactly was said?

A.      Right.

Although on direct examination, Dr. Irogoyen testified that it was impossible to predict whether someone would commit suicide, on cross-examination, he testified that a person with "major depressive disorder severe" is at a significantly increased risk for suicide. He also stated that depression is treatable, and eighty percent of people who are diagnosed with depression respond to treatment once it is recognized and an effective treatment program is commenced.

21

**F.     The Charge Conference**

After both parties rested, the court held a charge conference.  At the outset, Dr. Escobar's counsel requested to re-open the evidence "for the sole purpose of asking Dr. Escobar one question, and that is whether he was employed by Rio Grande State Center during March 26th of 2003, when he conducted the physical or psychiatric evaluation of Ms. Beverly Goss."  The Gosses responded that they were opposed to this action and that "even were that to be established by reopening the record, this defendant would not—position in this case would not change."  The trial court denied the motion.

The parties then lodged their objections to the charge.  Dr. Escobar objected that the charge omitted his affirmative defense official immunity.  He submitted three proposed questions.  Defendant's exhibit 6 is a proposed question on scope of authority:

> Do you find from a preponderance of the evidence that Dr. Diego Rodriguez-Escobar, was acting within the scope of his authority with respect to his psychiatric evaluation of Beverly Goss on March 26, 2003?

> "Scope of Authority" means a public official or employee is acting within the scope of his or her authority if he or she is discharging the duties generally assigned to him or her even if they are performed wrongfully or negligently.

Defendant's exhibit 7 is a proposed question on good faith:

> Do you find from a preponderance of the evidence that Dr. Diego Rodriguez-Escobar was acting in good faith with respect to his psychiatric evaluation of Beverly Goss on March 26, 2003?

> "Good Faith" means a public official or employee acts in good faith if a reasonably prudent official or employee, under the same or similar circumstances, could have believed that his or her acts were justified.

Defendant's exhibit 8 is a proposed question on discretionary function:

> Do you find from a preponderance of the evidence that Dr. Diego Rodriguez-Escobar, was performing a discretionary function with respect to his psychiatric evaluation of Beverly Goss on March 26, 2003?

"Discretionary function" means an act that requires personal deliberation, decision, and judgment.

The trial court refused all the instructions, indicated his ruling on each of the exhibits, and signed them all. On the record, the trial court stated the reason for his ruling:

As previously discussed by the Court with all the parties in chambers, the Court's reasoning for excluding all these questions and these instructions is that there was no evidence, no direct question asked of the defendant of whether he was a State employee or not, so that's not an issue that's in evidence at this time.

The jury rendered a verdict in the Gosses' favor, awarding damages to each of Beverly's three sons but not to her estate. The trial court rendered judgment on the verdict, and this appeal ensued.

## II. CAUSATION

By his first issue, Dr. Escobar argues that the evidence is legally and factually insufficient to support the jury's finding that his negligence proximately caused Beverly's injuries. Dr. Escobar argues that his evaluation and subsequent decision to release Beverly was "too remote" to constitute the legal cause of her death and that there were several "new and independent causes" that destroyed the causal connection between any negligence on his part and Beverly's suicide.

## A. Standard of Review and Applicable Law

When conducting a legal sufficiency review, we view the evidence in the light most favorable to the verdict to determine whether the evidence at trial would allow reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* We will

23

sustain a challenge to the legal sufficiency of evidence only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810. More than a scintilla of evidence exists, and the evidence is legally sufficient, if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Lee Lewis Constr. Co. v. Harrison*, 70 S.W.3d 778, 782-83 (Tex. 2001). However, "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

In conducting a factual sufficiency review, we do not substitute our judgment for that of the jury; rather, we view all the evidence in a neutral light to determine whether the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *See City of Keller*, 168 S.W.3d at 826; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 749 (Tex. App.–Corpus Christi 2006, pet. denied).

In a medical-negligence case, proximate cause must be established by expert testimony. *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988); *Klug v. Ramirez*, 830 S.W.2d 801, 804 (Tex. App.–Corpus Christi 1992, no writ). Proximate cause includes two

24

elements: "foreseeability" and "cause in fact."  *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).  "Cause in fact" means that "the act or omission was a substantial factor in bringing about the injury, and without it harm would not have occurred."  *Id.*[3]

## B.    Cause in Fact

Dr. Escobar argues that cause in fact is not established where a defendant's negligence "does no more than furnish a condition which makes the injuries possible."  He argues that his evaluation and subsequent release of Beverly was not the cause in fact of her suicide, but merely furnished a condition that made the suicide possible.  We disagree.

Dr. Escobar cites *Doe v. Boys Club of Greater Dallas, Inc.* to support his argument. 907 S.W.2d 472, 477 (Tex. 1995). In *Doe,* the supreme court held that "[c]ause in fact is not shown if the defendant's negligence did no more than furnish a condition which made the injury possible."  *Id.*   The court explained that "'[t]he evidence must go further, and show that such negligence was the proximate, and not the remote, cause of resulting injuries . . . . [and] justify the conclusion that such injury was the natural and probable result thereof.'" *Id.* (quoting *Boyd v. Fuel Distribs., Inc.*, 795 S.W.2d 266, 272 (Tex. App.–Austin 1990, writ denied)).  "[E]ven if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause."  *Id*.

In *Doe*, the plaintiffs were young boys and their grandparents, who had enrolled the

---

[3] "Foreseeability" means that "the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others.  Foreseeability does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence."  *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992) (citations omitted).  Although he mentions that foreseeability is an element of proximate cause, Dr. Escobar does not present any analysis of the evidence or argue that foreseeability was not established by the evidence.  Therefore, we do not address this element of proximate cause.  TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

boys in a summer camp through the Boys and Girls Club in June of 1986. *Id.* at 475-76. They sued the Boys and Girls Club after a camp counselor molested the boys. *Id.* The boys met the counselor at the camp, but the counselor then made friends with the grandparents, going to their home and even spending the night. *Id.* The sexual abuse occurred on overnight camping trips that occurred in the fall of 1986 and again in the summer of 1987, not organized by the Boys and Girls Club, but personally between the counselor and the grandparents. *Id.*

The grandparents and the boys alleged that the Boys and Girls Club was negligent in failing to screen and supervise its counselors, but the only items on the counselor's record that would have been discovered by a proper search and screen were two prior convictions for driving while intoxicated. *Id.* The supreme court held that the counselor's presence at the club was "but a preliminary condition in the course of events which made possible his assaults" on the boys, and given that the molestation did not occur on the club's premises, any failure to supervise the counselor was not a producing cause of any of the injuries. *Id.* at 478.

We fail to see the similarity between the *Doe* case and the present case. In *Doe*, the club's negligence in failing to screen and supervise the counselor and his resulting employment at the summer camp furnished a condition—the introduction of the counselor to the boys and their grandparents—but the alleged negligence was attenuated from the actual injuries in that it occurred outside of the counselor's employment with the club on private camping trips organized by the counselor and the grandparents. *Id.*

That is not what we have here. Here, Beverly was sent to a hospital to be evaluated for involuntary commitment because, after separating from her husband and while living

26

on her own, she attempted suicide. Dr. Escobar's alleged negligence occurred during this evaluation, the result of which determined whether Beverly would be released and on her own again.

Dr. Anderson and Dr. Irogoyen both agreed that a person with "major depressive disorder severe" is at a high risk for suicide, and Dr. Anderson further explained that Beverly's refusal of treatment was an indication that she was not getting better. Dr. Anderson explained that Dr. Escobar was negligent by failing to recognize, from the intake form at Tropical Texas, that Beverly had threatened to try to commit suicide again, and she opined that he was negligent by failing to call Beverly's doctors or her family to obtain more information, which would have revealed that Beverly was deceptive and manipulative.

Dr. Anderson testified that had Dr. Escobar admitted Beverly to the Rio Grande State Center, she would have received treatment for her depression. Dr. Irogoyen agreed that eighty percent of depression patients respond to effective treatment. Dr. Anderson explained that the goal of treating Beverly on an inpatient basis would have been to help her deal with the loss of her husband in a more effective manner. She testified that if Beverly had not been in the hospital, she "would not have been able to kill herself, at least not shoot herself," and Dr. Escobar agreed that Beverly would not have shot herself in the hospital if she had been admitted. Furthermore, Dr. Irogoyen testified that based on Beverly's prior suicide attempts after precipitating events, it was "expectable that she would respond to an event of that nature . . . ." The evaluation, therefore, was not merely a condition that allowed Beverly's injuries to occur. Rather, the evidence showed that Beverly's injury was the natural and probable result of Dr. Escobar's negligent evaluation and subsequent decision to release her.

27

The Texas Supreme Court recently addressed causation in a suicide case. *See Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 328-30 (Tex. 2008). While the court did not expressly state what *would* satisfy the standard of causation in this type of case, it did state why the evidence in that case *defeated* a finding of causation. *Id.* In that case, Lance Dowell, a twenty-one year old man, was taken to the hospital after he attempted suicide on the Friday before Labor Day in 1997. *Id.* at 325. A police officer escorted Lance to the hospital, and by the time they arrived, Lance "had calmed down and did not want to be hospitalized." *Id.* A nurse and emergency-room physician examined Lance, speaking to him very briefly, and neither made a comprehensive assessment of his risk for suicide. *Id.* at 326. Lance's mother arrived, and Lance informed her that he wanted to leave. *Id.* Because Lance was an adult, and because it was a holiday weekend, he could not be held involuntarily without a court order. *Id.* The doctor agreed to release Lance if he signed a no-suicide contract, agreed to an assessment at the MHMR center the following Tuesday, and promised to stay with his family until then. *Id.* at 326-27. Lance agreed to these conditions and further agreed to "talk with a friend, family member, or a staff person at [the hospital] if he had feelings or urges to hurt or to kill himself that he felt he could not control." *Id.* at 327. Lance was discharged to his mother's care, and she took him to a family reunion for the weekend. *Id.*

Lance attended the reunion, where he was surrounded by family, including his father, sister, and brother. *Id.* His mother needed to go to work, and she left Lance at the reunion with his father. *Id.* Lance behaved normally all weekend until Sunday afternoon. *Id.* On Sunday, Lance left his father to go help a family friend bale hay, and because he was acting normally, his parents were not concerned. *Id.* At 7:00 p.m. Sunday, Lance's

28

friend found his body hanging from a tree at the farm. *Id.*

The Dowells sued the hospital and the doctor, and the jury returned a verdict in the Dowells' favor. *Id.* at 327-28. On appeal, the defendants challenged the jury's finding of causation, and the court of appeals affirmed. *Id.* at 328. The supreme court held that the evidence was legally insufficient to support a finding that the defendants' negligence proximately caused Lance's injuries. *Id.*

The court first noted that there was no evidence that Lance would have consented to treatment or that the doctor could have prevented his discharge. *Id.* Lance had complete control over whether he would stay, and in fact, none of the family members believed he needed to be hospitalized. *Id.* Second, the Dowells' expert "never actually testified that hospitalization, more likely than not, would have prevented Lance's suicide." *Id.* The expert opined that Lance was at a high risk for suicide and that his discharge from the emergency room caused his death. *Id.* However, the expert gave "strong consideration" to testimony regarding a prior suicide attempt two years earlier, where Lance had been voluntarily hospitalized for several days. *Id.* He opined that if Lance had again been hospitalized, the outcome "most likely" would have been the same—that he would have recovered. *Id.* But when asked directly whether hospitalization would have prevented the suicide, the expert stated that Lance "would have improved" and been at a "lower risk" of suicide after treatment. *Id.* The court held that "[t]he issue is whether hospitalization would have made Lance's suicide unlikely, and the Dowells' expert rather pointedly did not offer that opinion." *Id.*

Third, the court held that Lance's discharge from the hospital was "simply too remote in terms of time and circumstances." *Id.* Significantly, the court noted that Lance

29

was surrounded by family at the family reunion and acted normally, and that "[i]f Lance had followed the written discharge instructions to '[s]tay w/parents', then as the Dowells' expert conceded, it is doubtful that he would have committed suicide." *Id.* at 328-29.

In sum, the court stated that the defendant's negligent conduct was their "failure to comprehensively assess his risk for suicide," and because there is

> no evidence that Lance could have been hospitalized involuntarily, that he would have consented to hospitalization, that a short-term hospitalization would have made his suicide unlikely, that he exhibited any unusual conduct following his discharge, or that any of his family or friends believed further treatment was required, the defendants' negligence was too attenuated from the suicide to have been a substantial factor in bringing it about.

*Id.* at 329-30.

All the factors that were missing in *Dowell* are present in this case. First, unlike *Dowell*, Dr. Escobar could have prevented Beverly's discharge—that is the reason he evaluated her. Beverly's family and all of the doctors that saw her prior to Dr. Escobar's evaluation believed that she needed further treatment. Second, unlike *Dowell*, Dr. Anderson testified that Beverly would not have shot herself if she had been in the hospital. And Dr. Escobar agreed with this statement. Dr. Anderson also testified, and Dr. Irogoyen agreed, that Beverly's depression was treatable. This testimony, unlike *Dowell*, demonstrated that hospitalization would have made Beverly's suicide unlikely.

Third, unlike *Dowell*, Beverly's discharge from the hospital was not "simply too remote in terms of time and circumstances." Had Dr. Escobar contacted Beverly's family, he would have known that the family was unable to supervise her. In fact, Dr. Escobar expressly stated he assumed that the family would supervise her, and therefore he discharged her despite the fact that he knew she had access to firearms. This is a far cry from the situation in *Dowell*, where the doctor specifically instructed Lance to remain with

30

his family, who had promised to supervise him, and Lance disobeyed the orders. We hold that this evidence was legally sufficient to support the jury's finding of cause in fact. *See id.* Furthermore, the evidence is factually sufficient; it was not so weak or the finding so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *See City of Keller*, 168 S.W.3d at 826; *Golden Eagle Archery*, 116 S.W.3d at 761. Accordingly, we overrule Dr. Escobar's first issue in this regard.

## C.  New and Independent Cause

Dr. Escobar further argues that his decision to release Beverly was too attenuated to be the cause of her death and that there were several "new and independent" causes of her injuries. He argues that "[e]ven though a person's conduct may breach a standard of care . . . , liability cannot be assessed for damages where an efficient intervening act or event caused the injury." He names several other people who Beverly saw after her release from Rio Grande State Center, who he argues had the ability and opportunity to prevent Beverly's injuries, pointing to evidence that: (1) Beverly went to Michael's house after her release; (2) Beverly was examined by Dr. Montgomery-Davis; (3) Beverly was visited by Compean; and (4) Beverly spoke to Timothy's wife Cleo the night before she was found dead. Dr. Escobar further argues that Beverly spoke to her estranged husband the day before her death, and this precipitated her suicide. We disagree.

"A new and independent cause is one that intervenes between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause." *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450 (Tex. 2006). To relieve the original tortfeasor from liability, the intervening cause must destroy

31

the causal connection between the original act and the injury. *Id.* If the subsequent act merely aids in the course of events that result in the injury, it is a "concurring act" and does not relieve the original tortfeasor of liability. *Wilson v. Brister*, 982 S.W.2d 42, 44 (Tex. App.–Houston [1st Dist.] 1998, pet. denied). "What generally distinguishes a superseding cause from one that merely concurs in the injury is that the intervening force was not only unforeseeable, but its consequences also unexpected." *Dew,* 208 S.W.3d at 451.

> [A] superseding cause is one that alters the natural sequence of events and produces results that would not otherwise have occurred. Or one that is "of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant." An intervening force will not break a causal connection if that force was itself probable or foreseeable by the original wrongdoer. It must be one not brought into operation by the original wrongful act and must operate entirely independently of such original act.

*Id.* (quoting 1 J.D. Lee & Barry A. Lindahl, MODERN TORT LAW § 4:7 at 4-14-4-15 (2d ed. 2002) (footnotes and citations omitted)).

The principal negligent acts in this case were Dr. Escobar's evaluation of Beverly, without contacting her family to inquire about her suicide threats and their availability to supervise her and without contacting her prior doctors, and subsequent decision to release her based on that evaluation. Had Dr. Escobar taken the time to call Beverly's doctors or her family, he would have known that Beverly's family could not supervise her, that she was manipulative, and that she had lied to her doctors about her condition. It was foreseeable that Beverly's contacts with her family would not result in their being able to prevent her suicide, and it was also foreseeable that her family physician and Compean would not recognize that she was suicidal because she was manipulative and had lied about her condition to doctors in the past. Furthermore, Dr. Anderson testified that in a divorce situation, it is likely that "there's going to be ongoing interactions, and that's why

32

you want the person to be in a better place so that when those ongoing interactions occur they don't kind of push you over the top." Dr. Irogoyen admitted that Beverly's prior suicide attempts had been the result of "precipitating events," such as the loss of her husband, and that it was foreseeable that she would react similarly to further precipitating events. Thus, it was certainly foreseeable that Beverly would have contact with her estranged husband, and that this could drive her to suicide. Accordingly, we hold that these were concurring events that did not break the chain of causation, and we overrule Dr. Escobar's first issue in this regard.

### III. OFFICIAL IMMUNITY

By his second issue, Dr. Escobar argues that he conclusively established his entitlement to the affirmative defense of official immunity. By his third issue, he argues that the trial court erred by refusing to submit the issue of official immunity to the jury.

### A.    Standard of Review and Applicable Law

Official immunity is an affirmative defense that shields public employees from personal liability "in performing discretionary duties in good faith within the scope of their authority." *Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994). "The purpose of official immunity is to insulate the functioning of government from the harassment of litigation, not to protect erring officials." *Id.* The defense of official immunity includes three elements: (1) the performance of a discretionary function (2) in good faith (3) within the scope of the employee's authority. *Id.*

Dr. Escobar had the burden to obtain a jury finding on this defense unless it was conclusively established by the evidence. *See* TEX. R. CIV. P. 279; *XCO Production Co. v. Jamison,* 194 S.W.3d 622, 632 (Tex. App.–Houston [14th Dist.] 2006, pet. denied). To

conclusively prove an affirmative defense, a party must have "'so conclusively proved each element of [that] affirmative defense . . . that there was no fact question to submit to the jury on any of its elements.'" *Kupchynsky v. Nardiello,* 230 S.W.3d 685, 697 (Tex. App.–Dallas 2007, pet. denied) (quoting *Brown v. Zimmerman*, 160 S.W.3d 695, 702 (Tex. App.–Dallas 2005, no pet.)). "A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence." *Id.*

Dr. Escobar objected to the jury charge's omission of his defense of official immunity, and he requested three questions on the issue, which the trial court marked "refused." *See* Tex. R. Civ. P. 276. A trial court must submit questions that are raised by the written pleadings and the evidence. *See id.* R. 278; *Brown v. Hopkins*, 921 S.W.2d 306, 317 (Tex. App.–Corpus Christi 1996, no writ). When an element of an affirmative defense is not supported by any evidence, the defendant is not entitled to have the defense submitted to the jury, and a trial court does not err by refusing to do so. *See Thomas-Smith v. Mackin,* 238 S.W.3d 503, 509 (Tex. App.–Houston [14th Dist.] 2007, no pet.) (holding trial court did not err in refusing jury question on official immunity where the evidence failed to raise a fact issue on the element of good faith).

## B.    Discretionary Function and the Exercise of Medical Discretion

Dr. Escobar argues that he conclusively established that he was performing a discretionary function, or at the very least, he presented evidence raising a fact issue on this element of his defense. We disagree.

In *Kassen v. Hatley*, the Texas Supreme Court considered whether a government-employed psychiatrist and nurse were protected by official immunity from liability for the suicide of a patient, Johnson, who they refused to admit to Parkland Hospital, a

34

governmental entity. 887 S.W.2d 4, 7 (Tex. 1994). There, Johnson had been in and out of institutions her whole life and had a "difficult patient file" at Parkland. *Id.* A police officer found her walking along a highway and determined that she was threatening to harm herself, so he picked her up and took her to Parkland. *Id.* Johnson's patient file at Parkland noted that institutionalizing her had not been therapeutic in the past, and if she presented to an emergency room, the physician there should refer her to Dallas County MHMR for outpatient services unless her symptoms were different from her previous admissions. *Id.*

Johnson was evaluated by a psychiatrist and a nurse, who discovered she exceeded the dosage of her medication; therefore, they took away her medication. *Id.* They decided not to admit her to the hospital. *Id.* When Johnson demanded that they give her back her medicine, threatening to kill herself if they refused, they jointly decided not to return it. *Id.* Johnson left the hospital, and a short time later, she committed suicide by stepping into freeway traffic. *Id.*

Johnson's family sued. *Id.* The trial court granted summary judgment for the psychiatrist, determining that he had conclusively established the doctrine of official immunity. *Id.* At trial, after Johnson's family presented their evidence, the nurse moved for a directed verdict on official immunity, which the trial court granted, holding that the nurse had also conclusively established the affirmative defense. *Id.* at 7-8. Johnson's family appealed, arguing that the exercise of medical discretion is not "'governmental' discretion." *Id.* at 8. The court of appeals reversed the summary judgment and the directed verdict, finding that the psychiatrist and the nurse did not exercise "governmental" discretion." *Id.*

35

The supreme court affirmed. *Id.* at 12. The court noted that some courts had held that official immunity only protects the exercise of discretion for functions that are "uniquely governmental," and it rejected that distinction. *Id.* at 10. It noted the conflicting goals that a government-employed doctor faces:

> Government service imposes constraints and responsibilities on health-care providers that private practitioners do not have. For example, government health care-providers have less latitude in choosing patients than their private-sector counterparts. Also, state-employed medical personnel often have policy-making or administrative responsibilities not shared by private-sector providers. At times, government doctors and nurses must decide how to allocate a scarce pool of state resources among possible recipients. Because of these circumstances, the good faith performance of governmental responsibilities should not be subject to second-guessing in the courtroom. Such litigation would result in a drain on state resources that are already scarce. It would further discourage qualified individuals from entering medical practice in the public sector. Government medical facilities are already hard-pressed to attract candidates because of government's typically lower salaries than in the private sector.

> On the other hand, once a government health-care provider begins to treat a patient, the duty of care owed to the patient is no different from the duty of care owed by any medical professional. If a doctor or nurse does not perform a medical procedure with the level of care and skill of an ordinarily prudent health-care provider, a patient injured as a result should not suffer without compensation for the sole reason that the doctor or nurse is a government employee.

*Id.*

To resolve these conflicting goals, the court held that in this context, "governmental discretion" must be distinguished from "medical discretion." *Id.* at 11. It held that "[a] state-employed doctor or nurse has official immunity from claims arising out of the exercise of governmental discretion, but is not immune from liability arising from the exercise of medical discretion." *Id.* Thus, "[c]ourts should look at the character of the discretion exercised in each instance." *Id.* The court cautioned that in some cases medical personnel may have duties and responsibilities that overlap with private-sector providers.

36

*Id.* at 12. In those cases, if "governmental factors and concerns colored the doctor's or nurse's discretion," then public policy may require official immunity. *Id.* The court recommended consideration of the following factors: (1) "the nature and importance of the function that the employee is performing"; (2) "the extent to which passing judgment on the exercise of discretion by the employee will amount to passing judgment on the conduct of a coordinate branch of government or an agency thereof"; (3) "the extent to which the imposition of liability would impair the employee's free exercise of discretion"; (4) "the extent to which financial responsibility will fall on the employee"; (5) "the likelihood that harm will result to the public if the employee acts"; (6) "the nature and seriousness of the type of harm that may be produced"; and (7) "the availability to the injured party of other remedies and forms of relief." *Id.* at 12 n.8 (citing RESTATEMENT (SECOND) OF TORTS § 895D cmt. f).

The court then turned to the evidence, which showed that the psychiatrist and the nurse refused to admit Johnson because of her difficult patient file, which stated that hospitalization was not "therapeutic" for her. *Id.* For the first time on appeal, the psychiatrist and nurse argued that they also considered the need to allocate scarce hospital resources, but the court refused to consider this argument as it had not been presented to the trial court. *Id.* Thus, the court held that the psychiatrist and nurse had failed to conclusively establish that they were entitled to official immunity. *Id.*

Here, not only did Dr. Escobar fail to conclusively establish that he exercised "governmental discretion," he also failed to present any evidence entitling him to a jury question. In his reply brief, Dr. Escobar argues that while his psychiatric examination required the exercise of medical discretion, "it was done for the purpose of investigating

37

the presence of the mandatory elements necessary to justify an emergency involuntary admission" as set out in the Texas Health and Safety Code. *See* Tex. Health & Safety Code Ann. § 573.022. Under section 572.022, the psychiatrist may not admit a patient involuntarily unless he concludes: (1) the person is mentally ill; (2) the person evidences a substantial risk of harm to themselves or others; (3) the risk of harm is imminent unless the person is immediately restrained; and (4) emergency detention is the "least restrictive means" by which the necessary restraint can be obtained. *Id.* § 573.022(a)(2). Dr. Escobar argues that the only element of this statute that required medical discretion was section 573.022(a)(2)(A), which required him to determine if Beverly had a mental illness. *Id.* We disagree.

First, the language of the statute indicates that all the elements necessary for involuntary commitment involve the exercise of medical discretion. Dr. Escobar points to section 573.012, which allows a municipal or county magistrate to issue a warrant to take a person into custody if they make similar findings—however, the language of the statute is different in that a magistrate's decision need only be based on "reasonable cause" and without examining the person who is allegedly mentally ill. *Id.* § 573.012(b). In contrast, section 573.022 states that once a person is taken into custody, the person must immediately be taken to a facility to be examined by a physician, who must render an "opinion" on the elements based on his or her "examination" of the patient. *Id.* § 573.022(a)(2).

Second, the testimony showed that Dr. Escobar relied on his medical discretion in determining the remaining elements for involuntary commitment. Dr. Escobar admitted on cross-examination that he was required to exercise "medical discretion" during his

examination. In Dr. Escobar's opening brief, he concedes that he reviewed the records and personally examined Beverly, observing her "appearance, manner of dress, facial expressions, abnormal movements and general demeanor." Based on his observations and his examination, he claims that he determined that (1) Beverly was suffering from depression due to her husband's departure; (2) she had no personality disorder, mental retardation, or learning disability; (3) she was not having suicidal or homicidal ideations at the time; and (4) that she could be treated on an outpatient basis rather than hospitalized.

Specifically with respect to whether Beverly evidenced a substantial risk of serious harm to herself that was imminent if she was not immediately restrained, Dr. Escobar's testimony revealed that his determination that Beverly was not suicidal and could be treated on an outpatient basis was not an exercise of governmental discretion, but was dependent upon his exercise of medical discretion. On cross-examination, Dr. Escobar stated that the likelihood that a patient will attempt to commit suicide is increased with depression, which is clearly something requiring a medical diagnosis. He also testified that lack of sleep could lead to a lack of good and clear insight, and he admitted that he knew that Beverly had trouble sleeping. For that reason, he prescribed antidepressants and sleeping pills for her—something only a medical doctor can do based on medical discretion. Dr. Anderson testified that Dr. Escobar's failure to obtain more information before releasing Beverly was negligent and that she would not have recommended outpatient treatment because it was not "safe" to do so. This testimony demonstrated that the last element, whether there are less restrictive means that can accomplish the necessary restraint, is also dependent on the psychiatrist's determination of the extent of the mental illness and dangerousness the illness causes.

Dr. Escobar does not point to any evidence in the record that establishes otherwise. Nor does Dr. Escobar address any of the factors that the supreme court listed in *Kassen*. For all these reasons, we hold that there was simply no evidence that Dr. Escobar exercised anything but medical discretion, and he is therefore not entitled to reversal on this basis.

Dr. Escobar further argues that he is entitled to immunity under section 571.019(b) of the Texas Health and Safety Code, which provides:

> (b)    A physician performing a medical examination and providing information to the court in a court proceeding held under this subtitle or providing information to a peace officer to demonstrate the necessity to apprehend a person under Chapter 573 is considered an officer of the court and is not liable for the examination or testimony when acting without malice.

TEX. HEALTH & SAFETY CODE ANN. § 571.019(b) (Vernon 2003).  That provision, however, only applies if a physician provides information to the court in a court proceeding or provides information to a peace officer—it protects the physician from being sued for defamation based on his testimony, not his medical malpractice in the examination itself. *See, e.g., James v. Brown*, 637 S.W.2d 914, 917-18 (Tex. 1982). Accordingly, we overrule Dr. Escobar's second and third issues.

## IV. CONCLUSION

Having overruled all of Dr. Escobar's issues, we affirm.


_____
GINA M. BENAVIDES,
Justice

Delivered and filed the
15th day of April, 2010.