

NUMBER 13-17-00621-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

FERNANDO JAVIER OTERO, M.D.,                          Appellant,

v.

RACHEL SALDIVAR AND ROBERTO
GARZA, JR., INDIVIDUALLY AND AS
NEXT FRIENDS OF XXX, A MINOR,                   Appellees.

On appeal from the 370th District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

Before Justices Rodriguez, Contreras, and Hinojosa
Memorandum Opinion by Justice Contreras

In this interlocutory appeal, appellant Fernando Javier Otero, M.D., challenges the

denial of his motion to dismiss the health care liability claim of appellees Rachel Saldivar

and Roberto Garza Jr., individually and as next friends of P.G.,[1] a minor.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(a)(9); 74.351(a), (b) (West, Westlaw through 2017 1st C.S.).  By one issue, Dr. Otero argues that the trial court should have dismissed the health care liability claim because the plaintiffs' expert report did not adequately address proximate causation.  We affirm.

## I.   BACKGROUND

On October 8, 2014, Rachel was admitted emergently at 11:45 p.m. to Doctors Hospital at Renaissance in Edinburg, Texas.  Rachel was over thirty-seven weeks pregnant with P.G. and complained of vaginal bleeding and lower right abdominal pain.  Rachel, however, was not evaluated in person by a physician until almost nine hours after her admission.  During that time, P.G.'s vitals deteriorated and indicated that P.G. was not receiving enough oxygen.  P.G. was eventually delivered via cesarean section at 9:22 a.m. on October 9, 2014, but without a heartbeat, and she was successfully resuscitated.  Subsequent MRI scans showed P.G. sustained hypoxic ischemic encephalopathy (HIE)—a severe, permanent brain injury caused by a lack of oxygen and blood flow.  P.G. spent forty-six days after birth in neonatal intensive care and was diagnosed with HIE, epilepsy, bronchiolitis, and uncontrolled seizures.

Two physicians oversaw Rachel's care from the time she was admitted at the hospital until P.G. was delivered:  (1) Carlos Eduardo Puig, M.D., who was the obstetrician and gynecologist responsible for Rachel from the beginning of her emergency care on October 8, 2014 until early the next morning; and (2) Dr. Otero, an obstetrician and gynecologist, who was called to evaluate Rachel at 8:19 a.m. on October 9, 2014,

---

[1] The plaintiffs' lawsuit is styled "Rachel Saldivar and Roberto Garza, Jr., individually and as next friends of XXX, a minor."  However, we will refer to the baby by her initials throughout this memorandum opinion.

2

evaluated her at 8:31 a.m., and subsequently performed a cesarean section on her at 9:22 a.m. Three hospital nurses also looked after Rachel during this time.

Rachel and Roberto filed suit against Doctors Hospital at Renaissance, Dr. Puig, and Dr. Otero for negligence resulting in the injuries suffered by P.G.; however, only their claim against Dr. Otero is relevant for the purpose of this appeal.

Pursuant to the Texas health care liability statute, Rachel and Roberto served Dr. Otero with an expert report authored by Mark D. Akin, M.D. *See id.* § 74.351(a). Dr. Otero filed objections to Dr. Akin's report and a motion to dismiss, and Rachel and Roberto then obtained leave from the trial court to file an amended expert report. According to Dr. Akin's amended report, Dr. Otero should have ordered a cesarean section immediately at 8:20 a.m. when he was informed over the phone of Rachel's condition and P.G.'s vitals. Instead, Dr. Otero examined Rachel at her bedside at 8:31 a.m. and decided to perform an elective surgery on another patient before performing Rachel's cesarean section at 9:22 a.m. Dr. Akin explains Dr. Otero's actions resulted in a delay of thirty-two minutes in P.G.'s delivery, after accounting for the thirty-minute window it takes from "decision to incision."[2] Dr. Otero again filed objections to Dr. Akin's report, which were overruled, and a second motion to dismiss, which was denied. This interlocutory appeal followed.

## II. STANDARD OF REVIEW

We review a trial court's decision on the sufficiency of an expert's report and on a motion to dismiss under the expert-report rule for an abuse of discretion. *Jelinek v.*

---

[2] Dr. Otero disputes that P.G's delivery was delayed by thirty-two minutes and instead contends it was delayed by nineteen minutes. Dr. Otero's argument is premised on the idea that the delay is measured from the time when he examined Rachel by her bedside, as opposed to when he first received the phone call informing him of Rachel's and P.G.'s conditions. As we explain below, Dr. Akin's report explains that the decision to perform a cesarean section should have been made when Dr. Otero was first informed of the situation during the phone call.

3

*Casas*, 328 S.W.3d 526, 539 (Tex. 2010); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. A court abuses its discretion if it acts in an arbitrary or unreasonable manner and without reference to any guiding rules or principles. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017). "When reviewing matters committed to the trial court's discretion, 'the reviewing court may not substitute its judgment for that of the trial court.'" *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 512–13 (Tex. 2017) (quoting *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992)).

### III. APPLICABLE LAW

Section 74.351 of the Texas Civil Practice and Remedies Code provides that a plaintiff in a health care liability suit must serve the defendant with a statutorily-compliant expert report accompanied by the expert's curriculum vitae. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. If a plaintiff fails to do so within 120 days of filing suit, the statute provides that the trial court must dismiss the claim with prejudice on the defendant's motion. *See id.* § 74.351(a), (b)(2). The report must include the expert's opinion on each of the three elements: standard of care, breach, and causation. *Jelinek*, 328 S.W.3d at 539. The goal is "to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011)). Therefore, "[a]n expert report . . . is a low threshold a person [bringing a claim] against a health care provider must cross merely to show that his claim is not frivolous." *Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012).

"A trial court must sustain a challenge to a report's adequacy if the report does not represent an objective good faith effort to provide a fair summary of the applicable standard of care, the defendant's breach of that standard, and how that breach caused

4

the patient's harm." *Miller*, 536 S.W.3d at 513 (internal quotation marks omitted); *see* TEX. CIV. PRAC. & REM. CODE. ANN. § 74.351(*l*), (r)(6). "A good-faith effort must 'provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit.'" *Miller*, 536 S.W.3d at 513 (quoting *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam)). All information needed for this inquiry is found within the four corners of the expert report, which need not marshal all of the plaintiff's proof. *Jelinek*, 328 S.W.3d at 539 (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 879, 879 (Tex. 2011)).

As to the causation element, the expert report must explain how and why the healthcare provider's breach proximately caused the plaintiff's injury*. Zamarripa*, 526 S.W.3d at 460. "Unquestionably, a plaintiff asserting a health care liability claim based on negligence, who cannot prove that her injury was proximately caused by the defendant's failure to meet applicable standards of care, does not have a meritorious claim." *Id.* There is no requirement that the expert use any particular words, such as "proximate cause," "foreseeability," or "cause in fact"; however, the expert's explanation of the plaintiff's injuries must be more than a mere conclusory assertion. *See id.* Thus, "the expert must explain the basis of his statements to link his conclusions to the facts." *Id.* (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)); *Jelinek*, 328 S.W.3d at 539. In our inquiry, we are precluded from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *Fulp v. Miller*, 286 S.W.3d 501, 509 (Tex. App.—Corpus Christi 2009, no pet.).

### IV. DR. AKIN'S EXPERT REPORT

5

By his sole issue, Dr. Otero makes several arguments in support of his claim that Dr. Akin's expert report does not adequately address proximate causation. Dr. Otero, however, does not dispute the applicable standards of care or breaches thereof as articulated by Dr. Akin. Thus, to aid our analysis and provide context for Dr. Otero's argument on appeal, we quote portions of Dr. Akin's amended report.

**A.     Standard of Care and Breach of Standard of Care**

Dr. Akin's amended report states:

Dr. Otero was informed by nursing staff of [Rachel's] admission for abnormal vaginal bleeding. He had a duty to evaluate the patient with a pelvic exam and diagnose the cause of her bleeding. His failure to do so was a violation of the standard of care.

The Standard of Care requires that the physician adequately insure fetal well-being based upon interpretation of fetal monitoring. This would require Dr. Otero to recognize:

1) Loss of heart rate variability

2) bradycardia

3) Repetitive late decelerations

His failure to assess fetal well-being was a violation of the standard of care.

The Standard of Care requires that a patient with abnormal uterine bleeding and evidence of a fetus [in] jeopardy be delivered emergently. His failure to recognize fetal jeopardy and his lack of due diligence to stay with the patient and deliver her as soon as possible violates the standard of care.

At 8:20 am Dr. Otero knew that [Rachel] was in active labor with category III fetal heart rate tracings. He also knew that Rachel had vaginal bleeding with contractions and high blood pressure readings. Despite this knowledge, at 8:20 am Dr. Otero did not make any orders or tell the nurses to be prepared for an emergency C-Section.

At 8:31 am Dr. Otero was at Rachel's bedside. At this point, it was the standard of care for Dr. Otero to examine Rachel and recognize the following:

- The baby has minimal variability and [decelerations], which are category III tracings.

6

- At 08:17 Ochoa, RN starts IV bolus, oxygen 10 liters non rebreather and turns the patient to the left lateral position. These nursing interventions to restore oxygenation failed and the baby continued to have category III tracings.
- The baby is in breech position.
- Rachel has vaginal bleeding.
- Rachel's contractions began at 3 am the prior day.
- Rachel had a previous C-Section.
- Rachel has insulin dependent diabetes.
- Rachel has pregnancy induced hypertension.
- Rachel has a history of pre-eclampsia.
- Rachel's blood pressure was 167/98 at 07:30.

Dr. Otero should have recognized that there were category III fetal heart rate tracings, which are abnormal and convey increased risk for fetal acidemia. These tracings are associated with increased risk of neonatal encephalopathy, cerebral palsy, and neonatal acidosis. Considering the tracings and the failed nursing intervention, and [Rachel's] conditions listed above, the standard of care required immediate delivery. Dr. Otero had an opportunity to recognize the deteriorating fetal status at 0831, but decided to perform an elective surgery on another patient prior to performing [Rachel's] Cesarean section. Dr. Otero should have performed an immediate C-Section on [Rachel] before the elective surgery. [Rachel's] condition and her baby's condition required immediate delivery. Since the prior nursing interventions failed, the only way to restore adequate oxygen to the baby was through delivery via C-Section. Every minute that the baby does not receive adequate oxygen causes more brain damage. Elective surgeries are not emergencies. Elective surgeries never take priority over situations where the mother in active labor is bleeding[], has irregular contractions, hypertension, diabetes, and high blood pressure and the baby has strong evidence of fetal distress. The decision to perform the elective surgery first, and deliver [Rachel's] baby later, was below the standard of care.

## B. Proximate Causation

Proximate cause has two components: (1) cause-in-fact and (2) foreseeability. *Zamarripa*, 526 S.W.3d at 460. Dr. Otero first argues Dr. Akin's report is deficient as to the "cause-in-fact" element. "For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—i.e., but for the act or omission—the harm

would not have occurred." *Id.* (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam)). "This is the causal relationship between breach and injury that an expert report must explain to satisfy" the Texas health care liability act. *Id.*

Dr. Otero argues that the damage to P.G.'s brain had already occurred prior to his decision not to immediately perform a cesarean section, and, therefore, his delay could not have been a "substantial factor" in bringing about the harm. We find this argument unpersuasive. In his amended report, Dr. Akin notes that:

> If Dr. Otero had not breached the standard of care, [P.G.] would have been delivered sooner (he was notified at 8:20 but did not deliver[] the baby until over an hour later) thus substantially decreasing her injuries. Dr. Otero should have ordered a C-Section at 08:20 am when he was notified of Rachel and the baby's conditions. Decision to incision is maximum of 30 minutes. Dr. Otero should have ordered a C-Section at 08:20 am. Therefore, if Dr. Otero ordered a STAT C-Section at 08:20 then the baby would have been born by 08:50. However, since Dr. Otero breached the standard of care by failing to recognize the fetal distress and delayed delivering the baby until 09:22 am, the baby suffered at least an extra 32 minutes of fetal distress from lack of adequate oxygen. I believe within reasonable medical probability that each minute of further delay before 09:22 until [P.G.] was delivered increased the extent of her permanent injuries.
>
> . . .
>
> Category III tracings were present on the fetal monitor strip before taking [Rachel] to the OR for cesarean section, and the absence of a fetal heart beat at birth, within reasonable medical probability, confirms that the fetal condition was worsening during the delay in delivery. Thus, Dr. Otero's unreasonable 32 minute delay caused substantial brain damage to the baby, which were confirmed by radiological manifestations of HIE after birth. The actions and inactions of Dr. Otero were a proximate causative effect of [P.G.'s] brain injury (HIE).

Dr. Akin explains how Dr. Otero's delay resulted in a prolonged deprivation of oxygen to P.G. and how prompt treatment would have immediately provided P.G. with the oxygen needed to prevent further injury to her brain. Therefore, according to Dr. Akin's expert opinion, the extent of P.G.'s brain injury would not have occurred but for Dr. Otero's failure

8

to act.  *See Zamarripa*, 526 S.W.3d at 460.  Furthermore, even if we were to assume that Dr. Akin's opinion could later be proved incorrect, it does not make his report inadequate.  *See Fagadau v. Wenkstern*, 311 S.W.3d 132, 139 (Tex. App.—Dallas 2010, no pet.) ("The possibility that facts may later be discovered that prove Dr. Goldman's opinions on causation are incorrect is not a basis for holding the report insufficient under section 74.351."); *Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 200 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (noting that although discovery could later prove that a doctor's opinion is wrong, that is not a basis for holding report insufficient under chapter 74).

Dr. Otero also argues that his decision could not have been a "substantial factor" in the injury because Dr. Puig and the hospital were the parties who caused the majority of the harm suffered by P.G.  However, contrary to Dr. Otero's argument, there can be more than one proximate cause of an injury.  *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001) (noting that there may be more than one act or omission that is the proximate cause of an injury); *Rodriguez v. Moerbe*, 963 S.W.2d 808, 819 (Tex. App.—San Antonio 1998, pet. denied) ("Proximate cause does not necessarily mean the last cause, or the act immediately preceding the injury."); *see also Taylor v. Christus Spohn Health Sys.*, 169 S.W.3d 241, 244 (Tex. App.—Corpus Christi 2004, no pet.) (noting that, in a health care liability suit against multiple defendants, an expert report must provide an explanation of how each defendant specifically breached the standard and how that breach caused or contributed to the cause of injury).  Thus, even if part of the injury had occurred prior to Dr. Otero's involvement, Dr. Akin's report makes it clear that Dr. Otero's delay resulted in part of the injury sustained by P.G., and "but for" his decision to postpone the cesarean section, P.G. would not have suffered some of her

9

injury. *See Zamarripa*, 526 S.W.3d at 460. Dr. Otero urges us to look at Dr. Akin's original report to find that Dr. Akin initially blamed Dr. Puig and the nurses for P.G.'s injury. While Dr. Akin's first report may have been deficient as to causation in regard to Dr. Otero, neither the original report nor the amended report indicate that Dr. Puig's and the hospital's failures were the sole cause of P.G.'s injury. Accordingly, we reject Dr. Otero's arguments that Dr. Akin's report was deficient as to the cause-in-fact element.

Next, Dr. Otero argues that Dr. Akin's report does not rule out any other possible causes for P.G.'s injury and diagnoses. However, an expert does not need to disprove or discredit every possible cause and need not speculate about other possible unknown causes and then disprove them. *See Bustamante v. Ponte*, 529 S.W.3d 447, 457 (Tex. 2017); *Nexion Health v. Taylor*, 294 S.W.3d 787, 797 (Tex. App.—Dallas 2009, no pet.). Thus, this argument is also without merit.

Finally, Dr. Otero argues that Dr. Akin's report is conclusory and fails to adequately explain how his delay in performing a cesarean section proximately caused P.G.'s injury. Here, Dr. Akin explains in scientific principles how the delay by Dr. Otero in performing Rachel's cesarean section resulted in some of the harm suffered by P.G. In addition to the text previously quoted, Dr. Akin explains that a baby is dependent upon its mother for oxygen, and the longer the baby goes without adequate oxygen, the more brain cells die. He also explains the medical conditions and symptoms exhibited by Rachel and P.G. and how they indicated that P.G. was suffering from a life-threatening lack of oxygen. He states in his report "[e]very minute that the baby does not receive adequate oxygen causes more brain damage." Dr. Akin goes on to state, "[t]herefore, in reasonable medical probability, the 32 minute delay was more time wherein the baby lacked adequate oxygen, which caused more brain cells to die", and "I believe within reasonable medical

10

probability that each minute of further delay before 09:22 until [P.G.] was delivered increased the extent of her permanent injuries." Thus, Dr. Akin explained the basis of his statements and linked his conclusions to the facts. *See Zamarripa*, 526 S.W.3d at 460.

The trial court could have reasonably concluded that the detailed opinions in the report informed Dr. Otero of the conduct called into question and provided a basis to show the claim's merit. *See Jelinek*, 328 S.W.3d at 529. It was not arbitrary or unreasonable for the trial court to conclude that the report constituted a good faith effort to provide a fair summary of the expert's opinion on causation. *See id.*; *see also Crawford*, 509 S.W.3d at 911. Therefore, we find no abuse of discretion in the denial of Dr. Otero's motion to dismiss. *See Jelinek*, 328 S.W.3d at 539.[3]

We overrule Dr. Otero's sole issue.

## V.    CONCLUSION

We affirm the ruling of the trial court.

DORI CONTRERAS
Justice

Delivered and filed the
24th day of May, 2018.

---

[3] Because we find no abuse of discretion in the trial court's denial of Dr. Otero's motion to dismiss, we need not address Dr. Otero's argument that the trial court erred in not awarding him attorney's fees upon the dismissal of the claim. *See* TEX. R. APP. P. 47.4.