# IN THE SUPREME COURT OF TEXAS

═══════════
No. 10-0511
═══════════

DIEGO RODRIGUEZ-ESCOBAR, M.D., PETITIONER,

v.

MICHAEL ALLEN GOSS, STEVEN GOSS, AND TIMOTHY LEE GOSS, INDIVIDUALLY
AND AS REPRESENTATIVES OF THE ESTATE OF BEVERLY GOSS, RESPONDENTS

═══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════

**PER CURIAM**

In this health care liability case, Dr. Diego Rodriguez-Escobar examined Beverly Goss to determine whether she met the criteria for involuntary hospitalization for psychiatric care. He decided she did not and released her. Three days later she committed suicide, which precipitated this suit based on allegations that Dr. Rodriguez-Escobar's failure to involuntarily hospitalize her was negligence. A jury found against Dr. Rodriguez-Escobar and awarded damages. The trial court rendered judgment on the verdict and the court of appeals affirmed. We reverse and render.

Goss had a history of suicidal behavior. She was depressed because her husband, Danny Goss, left her. On March 17, 2003 she discharged a shotgun inside her bedroom, which resulted in the police coming to her house. She told the officer that she wanted to take her life, so he took her to Texas State Tropical Center (Tropical) for a psychiatric evaluation. *See* TEX. HEALTH & SAFETY

CODE §§ 573.001–.002 (providing that a peace officer may initiate emergency detention proceedings without first obtaining a warrant). Goss received an initial screening at Tropical and was transferred to McAllen Medical Behavioral Health Center (MMBHC), a private hospital. She was admitted to MMBHC on a voluntary basis. *See id.* §§ 572.001–.005 (providing procedures for patients who are voluntarily admitted for inpatient mental health services).

Goss was treated at MMBHC for depression by Dr. Cesar Matos. During her stay she requested to be discharged, but withdrew her request after speaking with Dr. Matos. Her son, Michael, believed that she continued to be at risk of committing suicide and that she would try to leave MMBHC. Because of that belief, he obtained a Mental Health Warrant for Emergency Detention (Detention Warrant) to have her involuntarily admitted to a state mental health facility. *See id.* §§ 572.004 (requiring that a patient, voluntarily admitted, must be discharged within four hours of a written request unless a physician has reasonable cause to believe the patient requires emergency detention); *see also id.* § 573.011–.012 (providing that an adult may obtain a Detention Warrant by filing a proper application). Dr. Matos testified that he discharged Goss to Tropical with the intention that she be transferred to Rio Grande State Center (Rio Grande) for continued treatment, but that he had "no say who gets admitted or not there."

Goss was transferred to Tropical, where she was further referred to Rio Grande. At Rio Grande Dr. Rodriguez-Escobar conducted a preliminary examination which included reviewing the Tropical triage form, Michael's "Application for Emergency Apprehension and Detention," the Detention Warrant, and the medical records from MMBHC. He also interviewed Goss for approximately forty-five minutes. He testified at trial that she participated fully in the interview, was

2

calm, and was not agitated. After completing the preliminary examination, Dr. Rodriguez-Escobar concluded that Goss did not meet the criteria for involuntary hospitalization. She was released at approximately 10:00 a.m. on March 26, 2003 and Dr. Rodriguez-Escobar recommended out-patient treatment for her depression, including medication and follow-up appointments with Tropical.

The same day she was released, Goss visited Michael at his home. Michael testified that during this visit she seemed better. He also testified that Goss had full custody of his son, J.D., and he let J.D. go home with her.

The next day Goss attended a follow-up appointment with her family doctor, Joseph Montgomery-Davis, M.D. Dr. Montgomery-Davis re-evaluated her for depression and loss of sleep and authorized prescription refills.

Joe Compean, a social service worker at Tropical, visited Goss's home on March 28 to assess her home environment and to inform her of the importance of attending her next appointment. At trial he testified:

> I can say that she presented herself well. I mean, it was normal. I can't remember much, but I remember the conversation was, you know, comfortable. Just talking and telling her the importance of the appointment and her being agreeable.

Compean further testified that Goss did not appear depressed, sad, withdrawn, agitated, or confused, and that he did not observe any crying spells during his visit.

After her release from Rio Grande, Goss had two or three conversations with her neighbor, Sheriff Larry Spence. She had previously asked Spence to locate her husband, Danny. Spence testified that he asked her "[w]hat if [Danny] calls back and says he does not want anything to do with you whatsoever? Can you handle that?" She responded "I can live with that."

3

Goss called Danny on March 29 and they discussed their financial status and how they were going to "handle the separation." Michael testified that he also spoke with Goss on March 29. In that conversation she confirmed talking with Danny about finances and said that "she had intentions on going after his retirement and alimony." Shortly after 8:00 p.m. that evening Goss purchased a gun. She then dropped J.D. off at her son Timothy's house at approximately 12:30 a.m. on March 30, 2003. Later that day Sheriff Spence noticed a note on Goss's door and called the police. The transcript of his call was read to the jury. Sheriff Spence stated on this call that

> there is a big note taped to the front door of Beverly Goss' house and my wife went over and read it awhile ago and it says something, "I can't live without Danny" or something. . . .
>
> . . . .
>
> I think she made contact with him in Florida last night, is what she told me anyway, to stop looking for him, I found him. And she gave me a phone number where he was at. And maybe he told her something or something might have drove her off the edge.

Goss was later found dead in her home with a gunshot wound to the head.

Goss's sons—Michael, Timothy, and Steven—(collectively, the Gosses) sued Dr. Rodriguez-Escobar for negligence in failing to involuntarily hospitalize her. The jury found against Dr. Rodriguez-Escobar and awarded damages of $200,000. The trial court rendered judgment on the verdict and the court of appeals affirmed. ___ S.W.3d ___.

In this Court Dr. Rodriguez-Escobar does not challenge the jury finding that he was negligent. However, he asserts that (1) he has immunity under section 571.019(b) of the Texas Health and Safety Code which provides that "[a] physician performing a medical examination and

4

providing information to the court in a court proceeding under [the Mental Health Code] . . . is considered an officer of the court and is not liable for the examination or testimony when acting without malice"; (2) he has official immunity because he was performing a court-ordered examination of a person for involuntary commitment; and (3) the evidence of proximate cause is legally insufficient. The Gosses respond that (1) the issue of immunity under section 571.019(b) has not been preserved, and in any event the evidence and jury verdict do not support the claim; (2) the issue of official immunity has likewise not been preserved; and (3) the evidence is sufficient to support the jury finding that Dr. Rodriguez-Escobar's negligence proximately caused Goss's death. Assuming, without deciding, that the immunity issues were not preserved,[1] we agree that the evidence of causation is legally insufficient to support the verdict.

"The elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Id.* For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred. *See Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995) (citation omitted). A physician's failure to hospitalize a person who later commits suicide is a proximate cause of the suicide only if the suicide probably would not have occurred if the decedent had been hospitalized.

---

[1] "Official immunity is an affirmative defense." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994).

5

*See Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 328 (Tex. 2008). In addition, an actor's negligence "may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm." *Id.* at 329-30 (citations omitted).

In *Dowell*, we addressed whether a physician's negligence in discharging Lance Dowell proximately caused his post-discharge suicide. *Id.* at 328-29. In that case Dowell was taken to the emergency room (ER) by a deputy sheriff after he attempted to commit suicide because his girlfriend's parents told him to stay away from their daughter. *Id.* at 325-26. By the time he reached the ER he was no longer threatening to commit suicide. *Id.* The ER physician and nurse treated Dowell's wrist lacerations, and the physician agreed to release him if he signed a no-suicide contract, went to the local Mental Health and Mental Retardation center after the long weekend, and promised to stay with his family until he visited the center. *Id.* at 326-27. Dowell killed himself that weekend—approximately thirty-three hours after he was discharged from the ER. *Id.*

Dowell's parents sued the hospital and the attending ER doctor and nurse for negligently discharging him without a comprehensive assessment for his risk for suicide. *Id.* at 327-28. We held that Dowell's discharge from the ER was not a proximate cause of his death for two reasons. First, the plaintiff's expert did not testify that hospitalization more likely than not would have prevented Dowell's suicide, and there was no other evidence it would have. *Id.* at 328. Second, Dowell's discharge from the ER was "too remote from his death in terms of time and circumstances" to be classified as a proximate cause. *Id.* We held that "the defendants' negligence was too attenuated from the suicide to have been a substantial factor in bringing it about" because there was "no evidence that [Dowell] could have been hospitalized involuntarily, that he would have consented to

hospitalization, that a short-term hospitalization would have made his suicide unlikely, that he exhibited any unusual conduct following his discharge, or that any of his family or friends believed further treatment was required." *Id.* at 328-30.

To determine whether the actions of the defendants in *Dowell* proximately caused Dowell's suicide we analyzed both factors of the cause-in-fact element of proximate cause: whether the actions were a substantial factor in bringing about the suicide and whether, but for the actions, the suicide would not have occurred. In this case we need only consider the but-for factor. That is, we consider whether the evidence is legally sufficient to support the finding that absent the negligence of Dr. Rodriguez-Escobar—but for his negligence—Goss would not have committed suicide.[2]

To support their position that hospitalizing Goss probably would have prevented her suicide, the Gosses point to evidence indicating that her depression was treatable, she would not have shot herself in the hospital, and it was foreseeable she might commit suicide if she were not hospitalized. But they reference no evidence that hospitalization would have prevented Goss's suicide except for whatever time period she was hospitalized. The testimony on the issue was to the effect that (1) Goss likely would not have needed hospitalization for the rest of her life; (2) she probably would not have shot herself while hospitalized; and (3) hospitalization could have provided acute, immediate, short-term help, but her long-term status could not be predicted. The Gosses particularly reference

---

[2] Referencing *Dowell*, Dr. Rodriguez-Escobar also argues that his release of Goss was too attenuated from her suicide for it to have been a proximate cause of her death. He notes that three days passed from the time she was released from Rio Grande until the time of her suicide. During this time she went about her usual routine and a family member described her as "all right." During this time period Goss met with her family physician, who did not note anything unusual about her behavior, and Compean, the social service worker, who saw no indications of distress.

Because our determination that there is legally insufficient evidence to support proximate cause is dispositive, we address only that issue.

two passages of their expert's testimony that they say support a finding of cause-in-fact. The first is:

> Q: Do you have an opinion as to whether or not had she been hospitalized on March 26th, she would have survived?
>
> A: Well, if she had been in the hospital, I don't think that she would have been able to kill herself, at least not shoot herself. And hopefully if a plan had been in place, then her chances of having a better life would have been there. I don't know long term what her prognosis would have been. It would have depended upon a lot of things.

The second is:

> Q: Let me ask you another question, Doctor. . . . Taking this definition [of proximate cause] into account, Doctor, can you tell me whether you have an opinion as to whether or not Dr. Rodriguez-Escobar's negligence was a proximate cause of Beverly Goss's death?
>
> A: Yes.
>
> Q: And can you explain to us your opinion and the basis for it?
>
> A: You have somebody who is severely depressed with all the things we've discussed, all the risk factors and all the red flags, and release them on their own, that it is a reasonable - - one might reasonably foresee that a suicide would be a result.

The court of appeals concluded that the first passage of the foregoing testimony "demonstrated that hospitalization would have made [Goss's] suicide unlikely." ___ S.W.3d at ___. We disagree.

In *Dowell* we held expert testimony that Dowell "'would have improved' and been at a 'lower risk' of suicide when he left" the hospital was not evidence that hospitalization would have made the suicide unlikely. *Dowell*, 262 S.W.3d at 328 ("No one supposes hospitalization would

8

have made [it] worse."). Similarly here, evidence that Goss's depression was to some degree treatable or that the expert thought Goss would not have been able to shoot herself while hospitalized is not evidence that hospitalization would have made her suicide unlikely after she was released.[3] *See id.*

The question is not whether Goss was severely depressed or whether treatment would have reduced her depression—the parties do not disagree on these issues.[4] Nor is it whether she met the statutory requirements for involuntary detention under the Health and Safety Code or whether Dr. Rodriguez-Escobar's failure to involuntarily hospitalize her was negligence. Rather, the question is whether Goss's hospitalization on March 26, 2003 would have made her death unlikely. *See id.* Testimony in the first passage quoted above, that the expert did not think she would have been able to shoot herself while hospitalized, is not evidence that hospitalization probably would have prevented her from doing so after she was released. The testimony candidly affirms that view. And in the second passage quoted above, the expert addresses the foreseeability element of proximate cause but does not address the cause-in-fact element. Thus, neither passage is evidence that Dr. Rodriguez-Escobar's failure to hospitalize Goss was a cause-in-fact of her suicide.

Because there is no evidence that Goss's involuntary hospitalization by Dr. Rodriguez-Escobar probably would have prevented her death, the evidence is legally insufficient to support the finding that his negligence proximately caused her death. We grant the petition for review and

---

[3] We express no opinion about whether the evidence is sufficient to show that Goss probably would not have committed suicide in the hospital; that question is not before us.

[4] Dr. Rodriguez-Escobar provided Goss with a treatment plan for her depression which included follow-up treatments at Tropical and medication.

9

without hearing oral argument, TEX. R. APP. P. 59.1, reverse the court of appeals' judgment and render judgment in favor of Dr. Rodriguez-Escobar.

**OPINION DELIVERED:** February 1, 2013