# Supreme Court of Texas

---

No. 21-0238

---

Pediatrics Cool Care, et al.,

*Petitioners,*

v.

Ginger Thompson, Individually and as the Representative of the
Estate of A.W. (Deceased), and Brad Washington,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

---

JUSTICE BOYD, joined by Justice Lehrmann, dissenting.

Much about this case is no longer disputed. It is undisputed that a thirteen-year-old girl (A.W.) showed up with her mother (Mother) at the Pediatrics Cool Care clinic on March 1, 2012, seeking help for "severe depression," an inability to "control her feelings," and feeling "stressed out" and "sad all the time." Mother told the certified physician assistant who saw A.W. at the clinic that day that A.W. had been depressed "for some time," that she had a family history of depression and bipolar disorder, and that Mother herself was taking Celexa for depression.

It is undisputed that the physician assistant visited with A.W. for only a few minutes[1] before sending her home with a Celexa prescription, without having consulted the clinic's supervising doctor. The physician assistant failed to perform a psychiatric work-up, failed to utilize a standard questionnaire for assessing depression in adolescents, failed to adequately interview A.W., failed to attempt to talk to her without Mother present, and failed to ask her to promise that she would tell someone if she ever felt like hurting herself. The physician assistant testified that she could not recall whether she asked A.W. if she was experiencing thoughts of suicide or self-harm at the time. Nor could she recall whether she warned A.W. and Mother that Celexa could cause such thoughts. Although the physician assistant diagnosed A.W. with "depression," a medical assistant later altered A.W.'s records to reflect a diagnosis of "depressive disorder not otherwise specified" and then altered the physician assistant's thirty-day Celexa prescription to allow more refills than federal regulations or the clinic's policies permitted without a follow-up evaluation.

---

[1] The physician assistant testified that the visit was "probably" less than thirty minutes. But accepting the evidence in the light most favorable to the jury's verdict, as we must, the visit lasted "[m]aybe five minutes," as Mother testified. And—according to Mother—the physician assistant did not "strongly recommend[]" that A.W. seek counseling or provide a list of counselors. *Ante* at ___. To the contrary, according to Mother's testimony, Mother asked if the physician assistant would provide a list of counselors who would accept Mother's insurance because she "felt like that might be something [A.W.] would benefit from." The physician assistant told Mother that the nurse would provide a list, but she never did, so Mother left and called back later to request one. The clinic said they would mail her one, but they never did. By then, A.W. was telling Mother that she didn't want to see a counselor.

It is undisputed that A.W. returned to the clinic complaining of migraines on April 17, 2012, and was seen only by a nurse practitioner. Although A.W. and Mother both reported that A.W.'s mood had improved since the March 1 visit, the nurse practitioner assessed A.W. with migraines and "depressive disorder" and continued the Celexa prescription. The nurse practitioner did not conduct any further evaluation of A.W.'s depression or schedule any further follow-up. After A.W.'s death, and after this suit was filed, a medical assistant altered the records to falsely reflect that A.W. was asked "to come back in 30 days for follow up."

It is undisputed that, about three and a half months later, on July 31, 2012, Mother called the clinic to ask for a refill for A.W.'s Celexa prescription. The medical assistant who took Mother's call authorized a thirty-day supply and three refills even though she had no authority to prescribe medications, she failed to seek the supervising doctor's approval, federal regulations and clinic policies prohibited that many refills without a follow-up evaluation, and she did not require A.W. to return to the clinic for further evaluation before obtaining a refill. That medical assistant later attempted to alter the records to show that she authorized only a seven-day supply with no refills. But when she realized the pharmacy already had her original prescription, she instead altered the records to falsely state that she had instructed A.W. to return to the clinic for a follow-up evaluation.

As the Court notes, the defendants' expert witness testified that "suicide in teenagers is usually impulsive. It's unforeseeable." *Ante* at ___. But on cross-examination, the expert agreed that the suicide of a

3

patient with moderate to severe depression who is not "properly treated" is foreseeable, and that "an ordinary prudent physician can foresee that if you—if you don't properly treat a 14 year old with depression that suicide can occur." In any event, it is undisputed that on August 14, 2012—five and a half months after she visited the clinic for severe depression—then-fourteen-year-old A.W. died by suicide.

It is also undisputed that no one knows why A.W. chose to end her life. But A.W.'s parents did not have to prove the elusive why. What they had to prove was that the defendants were negligent and that, more likely than not, their negligence proximately caused A.W. to end her life. *See Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

Proving that one person's negligence proximately caused another person's suicide is difficult, at best. *See*, *e.g.*, *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam); *Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 328 (Tex. 2008). But after a seven-day trial, a jury found by a preponderance of the evidence that A.W.'s parents met that burden. In this Court, the defendants do not challenge the jury's finding that they negligently treated A.W. and breached the applicable standards of care. Instead, they argue that no legally sufficient evidence supports the jury's finding that their negligence proximately caused A.W.'s suicide. The Court agrees,[2] but I do not.

---

[2] The Court first concludes that the court of appeals erred by requiring only that the defendants' negligence was a "substantial factor" in causing A.W.'s suicide when it should have required the evidence to also show that A.W. would not have committed suicide "but for" the defendants' negligence. *Ante* at __. I agree with the Court's holding on this point. But the trial court properly instructed the jury to find both substantial-factor and but-for

4

At trial, A.W.'s parents presented Dr. Fred Moss to provide expert testimony on causation. Dr. Moss's credentials and qualifications to provide that evidence are also undisputed. As a board-certified psychiatrist who specializes in child and adolescent psychiatry, Dr. Moss had been working in the field for over thirty years and had treated many adolescent patients who "presented just like" A.W. Not one of them had died by suicide.

On direct examination, Dr. Moss agreed with and relied on the testimony of the other experts who testified that, when A.W. appeared on March 1 to seek help for severe depression, the defendants should have carefully interviewed her, without Mother present, to determine the nature and depth of her depression and to identify its potential sources. Dr. Moss then explained that the physician assistant's failure to appropriately and adequately evaluate A.W.'s condition and its causes prevented the defendants from identifying the treatment options they should have pursued. And by failing to require A.W. to return for follow-up evaluations "at least promptly over the next several days and weeks," the defendants essentially left A.W. without medical supervision when she needed it most. According to Dr. Moss, to a reasonable degree of medical probability, A.W. more likely than not would not have died by suicide on August 14, 2012, but for the defendants' failure to properly evaluate A.W. and to insist on follow-up appointments.

To determine whether a reasonable juror could have relied on Dr. Moss's testimony to find by a preponderance of the evidence that the

---

causation, so we can review the sufficiency of the evidence under that proper standard.

defendants' negligence caused A.W.'s suicide, we must consider all of the testimony the jury heard from Dr. Moss. Dr. Moss first explained that, by adequately evaluating and following up with A.W., the defendants *would* have been able to identify and pursue a variety of treatment options that, based on reasonable medical probability, *would* have prevented her from committing suicide:

> Q. Now, I want you to talk about the—can you—can you tell us the ways, sir, as you sit here today, that the treatment options that were available to [A.W.] to—that you believe, *based upon reasonable medical probability, would have prevented* her committing suicide on August 14th of 2012?
>
> A. Sure. So they're really going to be defined in no small part for—based on the answers to the questions that weren't asked in [A.W.'s] case, unfortunately, but if would—they would have been asked *would* have created pathways towards treatment options that *would* then be made available and then *would* have prevented her from committing—from, unfortunately, committing suicide on August 14th, 2012.
>
> Some of the things that *would likely* be made available, even on a more broad scale, include psychotherapy or a counseling, of course. And there's others. You know, designing a network of support in the community is something that works to just allay so much psychiatric symptomology. Having friends or having colleagues, having support systems in the community in the form of counselors or coaches or teachers or friends or neighbors or family members can go so far in really just reducing psychiatric symptomology. So certainly that would be something.
>
> Other types of treatment plan options, you know, nutritional counseling. We're not sure exactly

6

what [A.W.] was eating or not eating or drinking or not drinking and that would have been a space where we could have paid some attention to prevent the suicide on August 14th.

Perhaps group therapy might have been something that could have been helpful. [A.W.] might have been really, really happy to learn that there were other girls in the area that were struggling with whatever she was struggling with during those months. She's already in the band and I think there's—there was access to do some things in the band and, you know, creativity in creating music, art, dancing, singing, drum, gardening even. There's ways to really address creativity as a way of managing psychiatric uncomfortable symptomology.

And of course it goes on and on. There's sports that she might have been able to get involved with or clubs or peer groups or even, you know, a relationship with a teacher or two that she could check in with a couple times a week to make sure that things are moving on together or maybe create a role model relationship that has [A.W.] get that there's something she's actually living towards rather than—rather than what really did take place that day in August.

Exercise is one of the things that can be really, really helpful for this. Meditation can be helpful. Self-pampering can be helpful. Creating a confidential advocate can be really helpful. Even arranging for emergency telephone contact. Like having someone that she could call when things really got low or scary.

We don't know that she wasn't having that anyway because no one even asked her at any time during the workup whether things were reaching the point where she was, you know, at the edge of her rope or maybe even suicidal. There's no point in the record where [A.W.] was asked directly if she was considering suicide or was suicidal. I mean, that

would be—and not only suicide, but really despair and, you know, really being sad about it.

[Emphases added.] Dr. Moss then explained that, if the defendants had properly interviewed and evaluated A.W. and asked her the questions they should have, they likely would have created a connection with A.W. and enabled her to address and resolve her issues:

Q.   Let me ask you a question right there real quick. If— if they would have, like [another expert testified], properly kicked mom out of the room—

A.   Yeah.

Q.   —and they would have asked her and she would have said, hey, I've got some suicidal tendencies, I thought about it, those type of things, what would you do as a psychiatrist and would that prevent and there's—are there ways to help a person in that way to keep them from committing suicide?

A.   Well, certainly that's really a great space to work from. When a child says that I'm having suicidal tendencies, that's really a start of something new and really can start to look at, well, what impact would that have on your family? You know, what— what are we really looking at here when you're looking at wanting to exit versus killing yourself. Or, you know, have you tried it? Have you cut yourself? Have you taken pills? Have you, you know, tried to hang yourself are all the things that, unfortunately, kids do, dabble with sometimes when they're at the end of their rope.

    We would have been able to learn that and by creating that connection, normally the symptomology, once exposed, once it's not a secret, it's really amazing how kids find a reason to live just by saying and see that the world really didn't end.

8

Dr. Moss then testified that, based on reasonable medical probability, the defendants' actions—and more importantly, their failures to take actions they should have taken—created a "cluster of factors" that more likely than not caused A.W. to commit suicide, which she likely would not have done had the defendants not committed their negligent acts and omissions:

> Q. Can you tell the jury, *based upon reasonable medical probability*, what your opinion is as to what proximately caused her to commit suicide . . . on August 14th, 2012?
>
> A. Well, certainly I can't know for sure, but I would say beyond, you know, *within a reasonable degree of medical certainty* what I would say about this is that it's an accumulation. It's a cluster of so many things, so many things, so many acts and maybe more so. So many omissions of all the things I've listed here plus some that would have created pathways, that could have created connections, that could have created—I don't even know what it would have created had they been addressed initially.
>
> So it's mostly in the form of the omissions that I'm speaking towards. *And had any or most of these things been done, it is my, you know, professional opinion within a reasonabl[e] degree of medical certainty, that [A.W.] would still be with us today.*
>
> Q. And that's—that's on a *more [likely] than not* basis; is that correct?
>
> A. That is correct.
>
> Q. And that *but for* their actions if they would have—if they would have gotten—gotten her the type of treatment that she needed, based upon her

> presentation on March 1st, 2012, you believe, *based on reasonable medical probability*, that it's *more likely than not* that [A.W.] would be alive on August 14th, 2012?
>
> A.    I do believe that certainly—certain—yeah, I believe on August 14th, 2012, *more likely than not*, within a degree—*within a reasonable degree of medical certainty*, [A.W.] would have been alive on August 14th, 2012.

[Emphases added.]

Dr. Moss then explained that his opinion was based on his decades of relevant experience, training, and education, and on literature he had reviewed and relied on:

> Q.    And that's not just based upon your own—that's based upon your experience, your training, your certifications, but also on literature that you rely upon also; is that correct?
>
> A.    Yeah, there's some literature that I relied upon. It was—it has been initially based on mostly my education and experience like obviousness and, you know, I have—I have treated thousands of adolescents and none of them have committed suicide under my care. And many of them had depression or suicidal ideation on their initial presentation.

Dr. Moss then explained that, in addition to adequately evaluating and interviewing A.W. when she first complained of depression on March 1, the defendants should have scheduled regular follow-up appointments to keep tabs on A.W. and stay informed about how she was doing:

10

Q. [S]hould there have been more follow-up appointments . . . and how would you have prescribed it?

A. Yes. You know, again, I don't mean to keep saying the same thing, but depending on what I would have found out in my questioning, there would have been things to follow up on quickly, and quickly meaning at least promptly over the next several days and weeks.

So I think the next appointment classically is set up for about one week later unless it's a little more serious and then it can be set up even for tomorrow or three days or five days from now for the second appointment, depending on the seriousness, depending on the gravity, depending on the understanding of the patient, the safety of the patient and the supportive network of the family and the friends and the school, like who's here to monitor, who's there to be with the patient.

He then explained that, because of the defendants' failure to adequately interview, evaluate, and follow up with A.W. on and after March 1, it was hard to say exactly what the nurse practitioner should have done differently on April 17, but her failures on that date were part of the "collection of action that led to" A.W.'s suicide in August:

Q. Should—in your professional opinion as a—do you believe that at that point in time [the nurse practitioner] should have done the things that you just told the jury about?

A. That's a little bit harder. I think that, you know, that she looks back at the examination and sees what she sees and it's—and it's—I think in proper care of [the nurse practitioner] should be following up and really following up how things have gone.

11

In my practice my nurse, you know, assuming I had a nurse practitioner, first of all, six weeks later the patient will now be—had been seen the sixth time probably, not the first time in six weeks. So we would know what was going on and we'd be following up on what had come up, what had surfaced in our interviews. What had surfaced in the back and forth with the patient and the family and caretakers.

So it's a tough question to say, you know, after the sort of the wrongness of March 1st, what are you supposed to do in wrongness of April 17th? If there's a six-week stay there I'm already—I'm already out of my league to talk about what to do six weeks later on an acute depressive complaint because that isn't how it should have gone in the first place.

Q. Okay. Does—do you believe that, as you sit here today, that [the nurse practitioner] was part of the collection of action that led to [A.W.'s] suicide?

A. Yes, I do.

Q. And can you explain why?

A. Because I think that reviewing the records had [the nurse practitioner] been qualified—again, it's the same—it's the same problem I have with the last question. [The nurse practitioner], had she been working for me, would have been seeing the patient for the sixth time six weeks later. And, so, let's see, if she was working for me but then she got hired over there, and now she's there six weeks later, it's like, what is this? That what I—that's what I would expect her to be able to do.

Say what do you mean six weeks? What do you mean six weeks she hasn't been seen? What's going on here? Let me back up and go find out everything that's happened here and then she would go past March 1st and see the vomiting and see the

12

abdominal migraine and see all sorts of red flags and be able to respond that way.

Really [the nurse practitioner] is more or less working within the system that is created in the office, and formed within the office is standard of care of that office, but not standard of care at all of what would be expect[ed] from a competent mental health provider.

Dr. Moss then agreed with the other expert witnesses who testified that the medical assistant's handling of the phone call on July 31, in which the medical assistant authorized refills of A.W.'s prescription without authority or approval, fell well below the standard of care.

Q. [A]nd then moving forward to the July 31st telephone call that came in.

A. Yes, sir.

. . . .

Q. Would you agree with me that as mental health care providers there's absolutely—from a psychiatric mental health, there's absolutely no excuse for July 31st?

A. No. I've been trying to look for an excuse for July 31st all day. I don't have one yet.

Q. Do you believe, as you sit here today, for a mental health care provider, that that's outside, completely outside the standard of care?

A. There's no place for anything that took place on July 1st to—or July 31st in a mental health provider that's providing the standard of care.

Dr. Moss then concluded his direct examination by repeating his "firm opinion," based on reasonable medical probability, that the defendants' failures to adequately interview, evaluate, and follow up with A.W. more likely than not caused A.W.'s suicide:

> Q. Is it your opinion, sir, as you sit here today, that the actions and omissions of [the supervising doctor, the physician assistant, and the nurse practitioner], proximately caused [A.W.] to commit suicide . . . on August 14th, 2012?
>
> A. That is my firm opinion.
>
> Q. And that's based upon reasonable medical probability; is that correct?
>
> A. That's based on reasonable medical probability more likely than not.

On cross-examination, Dr. Moss admitted that he could not say that the defendants' decision to prescribe Celexa, standing alone, proximately caused A.W. to commit suicide, but he testified that the act of prescribing Celexa fit within the "cluster of omissions and acts" that more likely than not led her to do so:

> Q. Now, it's cristal [sic] clear you're—you do not believe that Celexa was a proximate cause of [A.W.'s] suicide, do you?
>
> A. It may have been. It's just part of the accumulation of acts and omissions that led to [A.W.'s] unfortunate demise on August 14th, 2012.
>
> Q. You answered [the defendants' lawyer's]—one of his first questions he asked you. He's saying, you're not here to say Celexa caused [A.W.] to commit suicide.

14

A. It's part of an extraordinary—an extraordinary cluster of omissions and acts that led in no small way more likely than not for [A.W.'s] unfortunate suicide on August 14th, 2012.

Dr. Moss then admitted he could not point to one single action the defendants could have taken that, standing alone, would have prevented A.W.'s suicide, but he again insisted that all of the defendants' negligent acts and omissions, taken cumulatively, more likely than not led her to take her own life:

Q. All right. Now, you talk about that different paths that could have been taken, right, and you list a bunch of things that could have been taken, could have gone differently for—if [the physician assistant] worked on different paths, right?

A. Correct.

Q. Yeah. Can you tell us specifically, specifically a path that would have been taken that would have prevented her suicide, I mean, specifically what [the physician assistant] could have done differently, would have done differently that would have prevented this suicide?

A. I cannot list a specific—one specific path that [the physician assistant] might have taken that would have prevented suicide reliably.

Q. There's no one thing that [the nurse practitioner] did that caused this suicide, agreed?

A. No. It's a—it's a cluster of a cumulative number of things.

Q. There's no one thing that [the supervising doctor] did that was a proximate cause of this suicide, true?

15

A.   That's correct. There's a cluster of a cumulation of a number of omissions.

Q.   There's no one thing that [the physician assistant] did that caused this—was a proximate cause of suicide, correct?

A.   Yes, sir. There's a cluster of a cumulation of omissions and acts that led to the suicide.

Q.   Now, with [the physician assistant] she could have gone a different direction, which you say she could have taken, that might have discovered things, correct?

A.   Correct.

Q.   But you can't point to any one thing you believe should have been done that was a proximate cause of [A.W.'s] suicide, true?

A.   I cannot point to one thing.

Q.   Right. If [the physician assistant] would have done exactly what you think she should have done, [A.W.] still might have committed suicide, true?

A.   The possibility exists that [A.W.] might have still committed suicide.

Q.   And if [the supervising doctor] did exactly what you think he should have done, exactly what you think he should have done, [A.W.] might still have committed suicide, true?

A.   *My professional opinion is that more likely than not [A.W.] would not have committed suicide, but she certainly could have.*

16

Q. Well, so to answer my question, [the supervising doctor] could have done exactly what you say he should have done and [A.W.] still might have committed suicide?

A. She might have committed suicide.

Q. And your—your belief and your testimony that had they done different things that she wouldn't have committed suicide, that's your—your belief, true?

A. I stand by that, yes.

[Emphasis added.]

Dr. Moss then reiterated that, although he could not know why A.W. took her own life, his lack of knowledge was the result of the defendants' failure to properly interview, evaluate, and follow up with her to find out what she was struggling with:

Q. You don't know—it'd be pure speculation, Dr. Moss, wouldn't it, pure speculation, for you to say that anything [the defendants] would have done differently would have prevented this suicide because you don't know why she committed suicide, do you?

A. No, but I *would* have known what was going on had we gone down any or all the pathways that I outlined earlier. And so I *would* have had a much greater access to what it was that was bothering [A.W.] to the point that she felt like she had to take her own life. My—

Q. My question is different. My question is, you don't know why she took her life?

17

> A. I don't know why she took her life because nobody was there to talk to her for several months prior to her taking her life.

[Emphases added.]

When asked to admit that he could not say exactly what the defendants could have done to prevent A.W. from taking her life, Dr. Moss again insisted that if the defendants had properly interviewed, evaluated, and followed up with her, that "more likely than not" would have led to treatment that would have prevented her suicide:

> Q. Not knowing why she committed suicide, you cannot say—you cannot opine what could have been done differently to prevent this suicide. That would be speculating, wouldn't it?
>
> A. Psychiatry is predicated really on getting answers to the questions that I outlined early so that we can get optimal outcomes and optimize the welfare of our patients. In this case [A.W.] was not given an opportunity to get that kind of care and I have no idea what August 13th would have looked like or August 14th would have looked like because nobody was with [A.W.] prior to her committing suicide at all.
>
> No professionals had been monitoring her either medically or psychiatrically or in a mental health version. There had been no schoolmates. There had been no medical support. There had been no contact with [A.W.] specifically for several months. There had virtually been no contact with [A.W.'s] parents for several months.
>
> There had been medications given to her that had black box warnings. There had been many different things that were missed that could have been done. And there's no way I can know today what that would have led to had I had any bit of that

18

information prior to August 14th. So that doesn't look like speculation to me.

Q. Well, you said there's no way you would know. There's no way you would have known what any of that looked like.

A. You're right. She may have possibly committed suicide anyways, but I sure am missing a boatload of information prior to that day, relevant information.

Q. I'm sorry?

A. Probably relevant information.

Q. Right. But you're still speculating, aren't you?

A. *More likely than not is all I have, sir.*

Q. Well, you don't have that.

A. Okay.

Q. You agree?

A. No, I don't agree.

[Emphasis added.]

In an extended series of questions and answers, Dr. Moss then acknowledged that he could not know exactly what information the defendants would have elicited had they properly interviewed and evaluated A.W. but again insisted that they would have obtained information regarding the "cumulative factors" that more likely than not would have enabled them to prevent her suicide:

Q. The questions and inquiries you believe should have been made that you've listed, the different paths to

go down that—those inquiries, questions, you don't know what the answers to those questions would have been, do you?

A. I do not.

Q. So you don't know if the answer to those questions, then, because you don't know what the answers would have been, you don't know whether the answers to those questions would be something that would prevent [A.W.] from committing suicide?

A. I don't know that, correct.

Q. You can't tell us the answer to any one of the questions that you think should have been asked, can you?

A. Because they weren't asked only, that's correct. None of us will be able to.

Q. Right. You can't point to one factor which would have made a difference in [A.W.] committing suicide, can you?

A. This is not a case that there's one factor.

Q. You can't point to cumulative factors in this case that would have prevented [A.W.] from committing suicide, can you?

A. No. I've been spending my whole testimony pointing to cumulative factors.

Q. Page 201 of your deposition, Doctor, I asked you that question. Beginning on line 12, you can't point to one factor, though, in [A.W.'s] case that would have made a difference of her not committing suicide, though, right? You said not a direct factor I cannot?

20

. . . .

A.   Right. My answer is true.

Q.   True. You stand by that answer, don't you?

A.   I do. And then I'm going to—I'd like to talk about the context of that answer as well because there is a context to that answer. I can't be to—I can't—because I don't know the answers to those questions, I don't have the specific cumulative factors that would have contributed to her suicide. What I do know is that upon—upon pursuing all the pathways that I brought up and more, several cumulative factors would have showed up, maybe, just maybe more likely than not preventing her suicide. But I, today, cannot point to the cumulative factors that contributed directly to her suicide simply because they weren't asked.

Q.   Well, even more likely—even more likely than not what information would have been gleaned had the treatment been as you think it should have been, the inquiries have been made as you think they should have been made, you don't know what information would have been elicited. That's pure speculation what would have been elicited, true?

A.   I don't know what would have been elicited.

Q.   All right. So every inquiry [the physician assistant] would have made, [the nurse practitioner] would have made or [the supervising doctor] would have made, any inquiry that they would have made that you think they should have made, you don't know what information they would have gleaned from that inquiry; is that true?

21

A.    Of course I don't know what would have been. I don't know the answers.

      . . . .

Q.    I'll show you in your deposition. I asked you, and you don't know—on page 203, line two. And you don't know whether the information they had gleaned from that inquiry whether or not not gleaning the information was a proximate cause of [A.W.] committing suicide, right? You said, I don't know that, that's right. See that?

A.    Looking at this now I feel like I'm being twisted around the words that I don't know the definitions of enough to know. I will stand by what I've stood by, which is that *had this questionnaire gone on anything like what I'm saying it should have, so much information would have been ascertained that the likelihood, more likely than not, that [A.W.] would be alive on August 14th is consistent with my medical opinion.* This concept of proximate is what I feel like I'm being circled around. I showed you, you know, like I—you said it, you said it once and that's not at all the spirit of what my testimony is today or what my testimony was at deposition.

      The specific one word of whether or not—and this is approximate. I really—I'm a doctor. I'm not an attorney and I—this whole idea of whether I said something that maybe for a moment fell on the other side of what I really mean feels like I'm being twisted semantically around a word that is a bit—so clearly isn't what my testimony is about.

      *My testimony is about that we didn't get any of the information necessary upon getting a chief complaint of depression for five months and we have a dead 14 year old here. And we have a dead 14 year old because nothing was done except throwing a pill at her and saying good-bye. That's my testimony.*

22

> There were many questionnaires and many pathways that were not pursued, and I say, *in my professional opinion for 39 years or 30 years of professional experience, that had they been pursued, more likely than not [A.W.] would not have committed suicide on August 14th, 2012, though I can't guarantee that.*

[Emphases added.]

Dr. Moss admitted that he couldn't point to specific "literature" or "facts" to support his opinion, other than the "facts" he experienced during his decades of education and experience treating troubled adolescents:

> Q. And you can't support that with literature, can you?
>
> A. No, I cannot.
>
> Q. And you cannot give your opinion because you say that is so—because you say that's so and that's not supported by the facts or literature, is it?
>
> A. 39 years education and experience.
>
> Q. But not the facts or literature?
>
> A. It's kind of—my experience is pretty factual, but it's not facts and literature.

Finally, on redirect examination, Dr. Moss again reaffirmed his opinion that—although there was much he could not know about why A.W. committed suicide—the defendants more likely than not would have prevented that result if they had properly interviewed, evaluated, and followed up with her on and after March 1, 2012:

23

Q.	But what we do know is and what your testimony basically says is that had we had the opportunity to ask those things about that you got in there, *you would have had the information and a way to deal and treat that through a network, correct?*

A.	Correct.

Q.	*And if you would have had that information, based upon reasonable medical probability, more likely than not you would have been—the clinicians, not just you, but any—any—anyone who has a head on their shoulders and can handle psychiatric or mental health would be able to prevent this suicide, correct?*

A.	*More likely than not.*

Q.	And when I say that, what he's basically saying is is that these actions, their failure to do what they needed to do from a mental health standpoint was a proximate cause to the reason that she committed suicide on August 14th of 2012, isn't it?

A.	Yes, sir.

[Emphases added.]

In short, this is not a case like *Rodriguez-Escobar*, in which the expert testified only that, "*hopefully* if a plan had been in place, then her *chances* of having a better life would have been there," but conceded that he didn't "know long term what her prognosis would have been." 392 S.W.3d at 114 (emphases added). Nor is it a case like *Dowell*, in which the expert testified only that, but for the defendants' negligence, the patient "would have *improved*" and been at a "*lower risk*" of suicide when he left the defendants' care. 262 S.W.3d at 328 (emphases added).

24

Instead, unlike the experts in those cases, Dr. Moss testified that it was his "firm" expert medical opinion that, if the defendants had not committed a "cluster" of negligent actions and omissions, and instead had interviewed, evaluated, and followed up with A.W. as they should have, then "more likely than not," based "upon reasonable medical probability," the defendants "*would*" have learned "so much" information that "*would* have created pathways towards" a variety of "treatment options" that "*would* have prevented her" from taking her own life. [Emphases added.] He did not merely "assume," as the Court suggests, that if the defendants had properly treated A.W. she would have disclosed her suicidal thoughts and accepted a treatment option. *Ante* at ___. Rather, he testified that in his expert opinion, based on thirty-plus years of successfully treating adolescents, A.W. more likely than not, to a reasonable degree of medical probability, *would* have opened up and accepted treatment had the defendants properly interviewed, evaluated, and followed up with her.

Whether we believe or are convinced by Dr. Moss's testimony is irrelevant. Considered in the light most favorable to the jury's verdict, his testimony would at least enable a reasonable juror to conclude, based on a preponderance of the evidence (more likely than not), that A.W. would not have committed suicide "but for" the defendants' negligence and thus provides legally sufficient evidence to support the jury's verdict. *See Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017).

The defendants complain—and the Court agrees—that Dr. Moss's testimony was insufficient because he could not identify exactly what information the defendants would have obtained from A.W. had they

properly interviewed, evaluated, and followed up with her, could not identify exactly which "pathways" or treatment options the defendants should have pursued, could not identify any single pathway or option that would *certainly* have prevented A.W.'s suicide, and could not say that A.W. would not have committed suicide even if the defendants had properly treated her. But neither the law nor the trial court's jury instructions required the jury to make any such findings. Although it is, in fact, undisputed that A.W. never disclosed to anyone that she was suicidal, *see ante* at ___, Dr. Moss testified that A.W. more likely than not *would* have disclosed such thoughts, or at least other sufficient information, if the defendants had properly evaluated, interviewed, and followed up with her. And although Mother testified that A.W. refused counseling after her March 1, 2012 clinic visit, *see ante* at ___, Dr. Moss identified numerous other treatment options that, more likely than not, *would* have provided the intervention necessary to prevent her suicide.

Similarly, although Dr. Moss in fact agreed that he could not identify one specific pathway or option that "would have prevented suicide reliably," *ante* at ___, he explained that the pathways that more likely than not *would* have been successful depended on the information the defendants more likely than not *would* have obtained had they properly interviewed, evaluated, and followed up with A.W. As the law requires, the jury charge properly asked only whether the defendants' negligence "was a substantial factor in bringing about" A.W.'s death on August 14, 2012; that without such negligence A.W.'s death on August 14, 2012, "would not have occurred"; and that a pediatrician or physician assistant "using ordinary care could have foreseen that" A.W.'s death on

26

August 14, 2012, "or some similar occurrence, might reasonably result" from their negligence. Regardless of all the things Dr. Moss conceded he could not establish, his testimony was legally sufficient to support the jury's answer to the question it was asked.

The Court, however, concludes that the record contains legally insufficient evidence because Dr. Moss's testimony was conclusory and mere "speculation" based on numerous "ifs." *Ante* at ___. First, the Court says, Dr. Moss's opinion depends on "if" the defendants "had questioned A.W. outside her mother's presence," *ante* at ___, but it is undisputed here that the defendants *should* have done that and were negligent by failing to do so. Next, the Court says, Dr. Moss's opinion depends on "if" A.W. "had divulged information about any current suicidal tendencies," *ante* at ___, but Dr. Moss testified that, more likely than not, A.W. *would* have disclosed that, or at least disclosed enough information, had the defendants properly interviewed, evaluated, and followed up with her.[3]

Finally, the Court says Dr. Moss merely speculated that A.W. would have consented to treatments and his assumption is belied by the fact that, early on, A.W. said she didn't want to go to counseling. *Ante* at

---

[3] The Court particularly emphasizes the lack of evidence that A.W. was suicidal on March 1, when she first sought help for her "severe depression." *Ante* at ___. But Dr. Moss explained at length his opinion that the defendants should have followed up with A.W. on a weekly basis after that first appointment to ensure that she was well and receiving the help she needed, and the defendants no longer dispute that they were negligent by failing to do so. Even if A.W. was not suicidal on March 1, she clearly became suicidal sometime between that date and August 14. Considering the undisputed evidence that Celexa can cause thoughts of suicide and self-harm, a reasonable jury could have concluded that the failure to properly follow up with A.W. was a proximate cause of her suicide.

___. But Dr. Moss testified that counseling was just one of many "pathways" the defendants could and should have provided, and he at least implicitly opined that A.W. would likely have accepted such assistance by repeatedly testifying that, had the defendants cared for A.W. as they should have, "she would still be with us today." We must consider all of the evidence and do so in the light most favorable to the jury's verdict, not cherry-pick Dr. Moss's more general or ambivalent statements while ignoring those that were specific and certain.

Finally, the Court concludes that Dr. Moss's testimony was incompetent to constitute sufficient evidence because it was conclusory and "not grounded in science." *Ante* at ___. Specifically, the Court critiques Dr. Moss for failing to provide a "reliable basis to differentiate between those patients who, with ordinary psychiatric care, would not commit suicide, and those who would, even with proper care." *Ante* at ___. But A.W.'s parents did not have to prove why some patients who receive proper psychiatric care nevertheless commit suicide and others do not. What they had to prove was that, more likely than not, A.W. would not have committed suicide had she received proper care. *See Gunn*, 554 S.W.3d at 658 ("Recovery in a medical-malpractice case requires proof to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant."). They provided that through Dr. Moss's testimony.

"To avoid being conclusory, an expert must, to a reasonable degree of medical probability, explain how and why the negligence caused the injury." *Id.* at 665. Dr. Moss did that. And he did so based on thirty-plus years of experience *successfully* treating thousands of

adolescent patients, many of whom presented just like A.W. Any assumption he made may not have been "uncontested or established as a matter of law," but it was "also not unfounded or scientifically unreliable on the face of the record, and the jury was free to credit both the assumption and the opinion resting on it." *Id.* at 663; *see also Draughon v. United States*, No. 14-2264-JAR-GLR, 2017 WL 3492313, at *6 (D. Kan. Aug. 15, 2017) ("Dr. Allen's opinions have a reliable basis in the knowledge and experience of the psychiatry profession, and specifically psychiatrists who specialize in suicide screening and prevention. The Government's objections to Dr. Allen's opinions are classic weight over admissibility challenges, and are thus denied.").

Because a reasonable juror could have found based on Dr. Moss's testimony that A.W. would not have died by suicide on August 14, 2012, but for the defendants' failure to properly interview, evaluate, and follow up with her on and after March 1, 2012, I must respectfully dissent.

Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** May 13, 2022