# Supreme Court of Texas

No. 21-0238

Pediatrics Cool Care, et al.,

*Petitioners,*

v.

Ginger Thompson, Individually and as the Representative of the Estate of A.W. (Deceased), and Brad Washington,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued February 3, 2022**

JUSTICE BUSBY, concurring.

The U.S. Centers for Disease Control and Prevention recently published national survey results showing "an accelerating mental health crisis among adolescents" who were isolated by the coronavirus pandemic in the first six months of 2021, with "more than 4 in 10 teens reporting that they feel 'persistently sad or hopeless,' and 1 in 5 saying

they have contemplated suicide."[1]  Teenage girls "are far worse off than their male peers"[2]: data show "a 50% increase in girls being admitted to the hospital for suspected suicide attempts between early 2019 and 2021."[3]

Youth suicide and depression rates were already rising long before the pandemic: "Between 1950 and 1988, the proportion of adolescents aged between fifteen and nineteen who killed themselves quadrupled.  Between 2007 and 2017, the number of children aged ten to fourteen who did so more than doubled."[4]  And "in 2019, one in three high school students and half of female students reported persistent feelings of sadness or hopelessness, an overall increase of 40% from 2009."[5]  The American Academy of Pediatrics has characterized these "worrying trends in child and adolescent mental health" as a "national

---

[1] Moriah Balingit, *"A Cry for Help": CDC Warns of a Steep Decline in Teen Mental Health*, WASH. POST (Mar. 31, 2022), https://perma.cc/6JNN-5AG4.

[2] *Id.*

[3] Eleanor Klibanoff, *In Pandemic's Isolation, an Alarming Number of Teenage Girls Are Attempting Suicide*, TEX. TRIBUNE (Feb. 1, 2022), https://perma.cc/6EXU-HJ3S.

[4] Andrew Solomon, *The Mystifying Rise of Child Suicide*, THE NEW YORKER (Apr. 4, 2022), https://perma.cc/LJ6V-UNEK.

[5] OFFICE OF THE SURGEON GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., PROTECTING YOUTH MENTAL HEALTH: THE U.S. SURGEON GENERAL'S ADVISORY 3 (2021).

emergency,"[6] while the U.S. Surgeon General has called them "alarming" and their effects "devastating."[7]

Amid this "surge in extreme mental distress,"[8] it is more important than ever for medical providers to comply with the standard of care, which evidence at trial showed offers young patients in distress—and their families—pathways for survival and a better life to come. The defendant providers in this case no longer challenge the jury's finding that they failed to comply with the standard of care in treating thirteen-year-old A.W., who told them she felt "sad all the time" and "couldn't control her feelings." Less than five months and at least eight separate breaches of the standard of care later,[9] A.W. died by suicide. After this suit was filed, the defendants' employee added false statements to A.W.'s medical records in an unsuccessful effort to conceal their negligence, as the evidence at trial showed.

Our legal system provides civil, criminal, and administrative remedies for such misconduct that are not exclusive of each other and work together to promote better medical care and prevent future harm

---

[6] Solomon, *supra* note 4.

[7] OFFICE OF THE SURGEON GEN., *supra* note 5.

[8] Klibanoff, *supra* note 3.

[9] *Ante* at 4–5. Sadly, there are indications that such breaches are far too common. "[D]epressed or suicidal children . . . remain radically undertreated. There are too few child psychologists and psychiatrists, and most pediatricians are insufficiently informed about depression." Solomon, *supra* note 4. The Surgeon General recently concluded that "[o]ur health care system today is not set up to optimally support the mental health and wellbeing of children and youth." OFFICE OF THE SURGEON GEN., *supra* note 5, at 21.

to patients. Here, A.W.'s parents brought a common-law civil tort suit against A.W.'s medical providers. No party objected to the trial court's jury charge, which required the parents to prove that the providers' negligence "proximately caused" A.W.'s death and supplied the usual definition of proximate cause, which demands proof of but-for and substantial-factor causation as well as foreseeability.

As our medical negligence cases involving suicide have shown, this is a difficult causation standard to meet with expert psychiatric testimony.[10] And it was especially difficult to meet here, as the providers' negligence fell so far below the standard of care that they did not even ask the most basic preliminary questions designed to identify promising pathways for treating A.W.'s severe depression. Our requirements for proving causation should not hold the severity of the providers' negligence against A.W.'s family, and I do not understand the Court's opinion to do so. It is not the law that if a defendant breaches the standard of care badly enough, it can become impossible for a plaintiff to prove that the patient likely would have lived with proper treatment.

I agree with the Court, however, that the plaintiffs' psychiatric expert did not identify a treatment or combination of treatments that likely would have prevented suicide. Nor did he identify any factors that differentiate properly treated patients who nevertheless commit suicide from those who survive, or explain why it was likely that A.W. fell into

---

[10] *See Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 114–15 (Tex. 2013) (per curiam); *Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 330 (Tex. 2008).

4

the latter category. *Ante* at 19–20. I therefore join the Court's opinion. I also write separately to make two points about what the opinion does not decide.

**First**, this case does not present any question about whether the proximate causation standards we ordinarily apply in medical negligence cases should be tailored in suicide cases to account for the current capabilities and limitations of psychiatric science. *Cf. Bostic v. Ga.-Pac. Corp.*, 439 S.W.3d 332, 344 (Tex. 2014) ("While but for causation is a core concept in tort law, it yields to the more general substantial factor causation in situations where proof of but for causation is not practically possible or such proof otherwise should not be required."). There is no record before us on this question, and we appropriately express no view on it. Our ordinary causation standards were included in the jury charge without objection, so we must measure the sufficiency of the evidence by the charge as given. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). I agree with the Court that the variation of but-for causation in multiple-provider negligence cases addressed in *Bustamante v. Ponte*, 529 S.W.3d 447, 457 (Tex. 2017), does not affect the outcome here. *Ante* at 13–15, 15 n.38.

**Second**, although a common-law remedy for medical negligence requires proof that the providers' negligence caused the patient harm, it is important to be clear that the administrative and criminal remedies available for such negligence do not. Rather, the Texas Medical Board and district attorneys can take independent action to address the accelerating adolescent mental health crisis, helping to promote better

5

medical care for—and prevent future harm to—young Texans and their families.

The Texas Medical Board and its advisory Physician Assistant Board are authorized to regulate the practice of medicine in Texas, which includes the licensing and discipline of providers and the investigation of complaints filed by the Board itself or by private parties. *See* TEX. OCC. CODE §§ 152.001(a), 154.051(c), 154.057, 155.002(a), 164.001(a), 204.101(4). The Board may discipline a provider who "fails to practice . . . in an acceptable professional manner consistent with public health and welfare," *id.* § 164.051(a)(6); *see id.* § 204.304(a)(5), such as by "fail[ing] to treat a patient according to the generally accepted standard of care." 22 TEX. ADMIN. CODE § 190.8(1)(A); *see id.* § 185.18(b)(1)(A). Providers also must maintain "adequate" medical records, *id.* § 165.1(a), and discipline can be imposed for "unprofessional or dishonorable conduct that is likely to deceive or defraud . . . or injure the public." TEX. OCC. CODE § 164.052(a)(5); *see id.* § 204.302(4). A physician remains responsible for medical acts delegated to others. *See id.* § 157.001(b). Disciplinary actions may include license suspension or revocation, probation, public reprimand, counseling, or supervised practice. *See* TEX. OCC. CODE §§ 164.001, 204.301.[11]

---

[11] The Texas Nursing Board may discipline nurses for similar actions. *See* TEX. OCC. CODE §§ 301.151, 301.452(b)(10), 301.453, 301.457. Unlike discipline of physicians and physician assistants, discipline of nurses for failure to conform to minimum standards of acceptable nursing practice requires that a patient or other person be exposed unnecessarily to risk of harm, though actual patient injury is not required. *See id.* § 301.452(b)(14); 22 TEX. ADMIN. CODE § 217.11. Nurses may also be disciplined for misconduct, which includes falsifying reports. TEX. ADMIN. CODE § 217.12(6)(A).

6

In addition, a physician who violates an applicable statute or rule commits a Class A misdemeanor. *See id.* § 165.151. As with the other sources of enforcement authority, injury to a patient is not an element of the offense. Administrative and criminal remedies are separate from and in addition to common-law remedies, so they are not precluded by any determination regarding the sufficiency of the evidence to support a common-law damages remedy.

With these observations, I join the opinion of the Court.

J. Brett Busby
Justice

**OPINION DELIVERED:** May 13, 2022

7